622 So.2d 795 (1993)
Theresa A. SMITH
v.
Curklin ATKINS.
No. 92-CA-1946.
Court of Appeal of Louisiana, Fourth Circuit.
July 27, 1993.
*796 Catherine J. Smith, New Orleans, for plaintiff-appellant.
Curklin Atkins, pro se.
Before SCHOTT, C.J., and BARRY, CIACCIO, PLOTKIN and WALTZER, JJ.
WALTZER, Judge.
Plaintiff sued for defamation. The trial court rendered judgment for $1,500.00 general damages. We affirm the trial court's finding on liability in this case, but increase the award to $5,000.00. We further find that based on the record there was proof by the preponderance of the testimony and evidence that the defendant committed the tort of intentional infliction of emotional distress and that the plaintiff was defamed.
FACTS:
Curklin Atkins was in his first year as a professor at Southern University Law School. He taught Theresa Smith Corporations and Administration of Criminal Justice. According to the testimony of many male law students in the class, Professor Atkins continuously discussed his personal social/sex life in corporations class, making comments such as stating that he had taken a woman on a date the prior weekend and that "he expected more from her than just dinner". Throughout the semester, he continuously made Theresa Smith and another female student the example in his hypotheticals or the butt of his comments. After the first occasion, Theresa Smith went to Professor Atkins after class and asked him to stop. He ignored her and continued to make her the butt of his comments throughout the semester. Professor Atkins also made offensive and disparaging comments about other students in his class. A number of the male students commented that they were embarrassed by the comments that Professor Atkins made and that his behavior was inappropriate in a law school setting and unprofessional.
During the semester, Professor Atkins frequently told the class that he had seen Theresa Smith at a nightclub named "Whispers" in New Orleans over the weekend. On Monday, March 7, 1991, he publicly ridiculed and humiliated Theresa Smith by recounting an embarrassing moment that had happened to her the past weekend at "Whispers".
On the night in question, Theresa Smith had a number of drinks. She left her seat and walked across the room to say hello to a friend. After the conversation, she walked back across the room to her seat. While sitting down, she missed the seat, landing on the floor. During the corporations *797 class, Professor Atkins recounted this embarrassing moment to the entire class at Theresa's expense.
On this particular occasion, Theresa determined that she would not sit quietly by and take it, but rather would attempt to verbally defend herself. She countered with "Why didn't you help me up?" He responded with either "I ain't pickin' no Slut up off the floo'" or an elaborate mock stage-whisper "Slut". Theresa Smith was mortified and humiliated, froze and left the room, whereupon she immediately became physically ill.
Professor Atkins again called her a slut for a second time in the Administration of Criminal Justice class later that day.
According to the testimony, the news that Professor Atkins had called Theresa Smith a "Slut" in class passed through the law school like wildfire. Theresa Smith was the butt of many jokes by her peers. The next day she went to Chancellor B.K. Agnihotri, Chancellor of the Southern University Law Center and reported the incident. Chancellor Agnihotri called Professor Atkins to his office for an explanation. Chancellor Agnihotri testified at trial that Professor Atkins denied calling the plaintiff a slut at which time the Chancellor instructed him to put his denial in writing. Chancellor Agnihotri then appointed Professor Stanley Halpin to conduct an investigation. On March 9, Professor Atkins entered class and began writing numerous homework assignments on the chalkboard. He stated that he would continue to write more and more assignments on the board until Theresa Smith apologized to him. Professor Atkins also threatened to give bad grades to any student who signed an affidavit against him. On March 21, eleven students submitted affidavits indicating that they were witnesses and that Professor Atkins had in fact called the plaintiff a "Slut" in class. Meanwhile Professor Halpin reported to the Chancellor that his investigation revealed that Professor Atkins had in fact called plaintiff a slut in class. The Chancellor concluded that Professor Atkins had lied to him when he first denied the incident and the Chancellor ordered Professor Atkins to publicly apologize to Theresa Smith in class. On April 19, 1991, Professor Curklin Atkins publicly apologized to Theresa Smith, who taped the apology. Although usually against school rules, the Chancellor made an exception and allowed Theresa Smith to change sections of corporations, however it was only a few weeks before finals and the other section used completely different materials in class. At the final, Professor Atkins distributed color coded examinations. No other color coded exams had ever been used in the history of Southern Law School. An underground newspaper entitled "Iconoclast" appeared, rehashing the entire situation. Handicapped by insufficient time to learn completely new materials, Theresa Smith received a D in corporations class. Students in Professor Atkins corporations and administration of criminal justice classes received color-coded exams and believe that Professor Atkins intentionally and maliciously lowered their grades. Chancellor Agnihotri issued a disciplinary letter to Professor Atkins stating "our dissatisfaction and condemnation of your statement in the classroom. I hope you will appreciate that the Law Center ... has to protect the integrity of all its constituents." Professor Atkins had a one year contract with Southern; he was not offered another contract. On May 31, 1991, plaintiff filed suit solely against Curklin Atkins.
REACTION OF HER PEERS:
Numerous students testified that after the name-calling incident, they stopped associating with Theresa Smith. One student stated that while she did not believe Professor Atkin's allegation, the gossip became so bad that if you associated with Theresa, other students would then target you as the butt of their jokes and gossip. A student testified that she was head of the Moot Court Board and a serious student who anticipated a serious and successful career in law and that she could not afford to be associated with someone of low moral character, that it had the potential of impacting negatively on her career. Another student testified that although he had never thought that Theresa Smith was *798 a slut, when the Professor called her that openly and in class, he thought that there might be some basis to it"after all he was a Professor"and he began to wonder about Theresa. Another student testified that the incident would cause him not to offer Theresa a partnership or a job if he were in a position to do so, because he could not afford to have someone of questionable character affiliated with him professionally. Other students thought that actively associating with Theresa would cause Professor Atkins to retaliate with bad grades.
Theresa testified that as a result of the incident she began to withdraw from the other students. She no longer joked for fear that something would be taken out of context or the wrong way. She no longer socialized with other students. She changed her manner of dressing and hesitated before speaking. She felt that the other professors and the other students shied away from her and treated her differently than they had before the incident. She called it the "most traumatic" thing that had ever happened in her life. She further testified that she is intimidated by Professor Atkins and that it makes her uncomfortable to be in his physical presence. Theresa experienced insomnia, crying spells, poor attention span, inability to concentrate, and general depression. She experienced mood and personality changes and limited her association with her peers. She became obsessed with the incident.
MEDICAL TESTIMONY:
Theresa was referred to Dr. Guillaume by Dr. Williams, a gastroenterologist. Dr. Lionel Guillaume, M.D., incorrectly named Guillant in the trial court's reasons for judgment, was plaintiff's treating psychiatrist. Dr. Guillaume diagnosed plaintiff as suffering from "adjustment disorder with depressed mood". He never diagnosed her as suffering from delayed distress disorder, because he diagnosed her as suffering from "adjustment disorder with a depressed mood".
Page 197 of the transcript indicates that he testified as follows:
"A. I think she was overwhelmed. She was tearful. She cried on many sessions, especially whenever she started relating the incident. And she felt likeI mean, it was uncalled for, the name calling. This is what she said.
Q. Are there any particular exams that you would conduct on Ms. Smith?
A. As a psychiatrist we do a psychiatric evaluation, mental psychiatric examination. Based on my examination she didn't have any evidence of or information on what we call a thinking disorder. She was in contact with reality. And all I can say, based on the evaluations, my impression was what I call an adjustment disorder with a depressed mood.
Q. Did you prescribe any medication to Ms. Smith?
A. After my first evaluation I recall that I prescribed Doxepin, twenty-five milligrams at bedtime by mouth. At bedtime. The reason that I prescribed that is because some of the symptoms of depression, i.e. crying spells, poor attention span, the inability and sleeping difficulty."
Page 209 of the transcript provides as follows:
"A. Well, I mean, you have to be careful with that statement. Because I mean, if you look at post traumatic stress disorder, you can have what they call an acute post traumatic experience experiencing the symptoms right away. And you may have a delayed stress disorder. But this is saying that in that incident you're experiencing the symptoms later on.
Q. Did Theresa Smith have a post traumatic stress disorder?
A. I will not call it post traumatic stress disorder. I said adjustment disorder with depressed mood."
*799 The above quoted two sections of transcript are the only times in the entire trial that the term "delayed stress disorder" is mentioned. Dr. Guillaume testified that Theresa Smith will continue to need treatment on an outpatient basis for an indeterminate amount of time.
The trial court found defendant had defamed plaintiff, but did not find intentional infliction of emotional distress or invasion of privacy. The trial court further found that although the defamation had occurred, there had been "a complete lack of proof by plaintiff of damage to reputation or loss of esteem of her fellow student." The court granted damages in the amount of $1,500.00 plus legal interest and costs.
We find that Curklin Atkins engaged in an intentional long-term campaign of verbal bullying, ridicule and humiliation targeted at his student. We hold that calling a female law student a "slut" is defamatory per se.
THE LAW:
In Manale v. City of New Orleans, Dept. of Police, et al., 673 F.2d 122 (U.S.C.A. 5, 1982), the Federal court applied Louisiana law. Manale, a former New Orleans police officer sued the City, Department of Police and officers Donald Brewer and Joseph Orticke. Orticke on one occasion and Brewer repeatedly referred to Manale in derogatory terms suggesting that he was a homosexual. Manale and others complained of harassment. On November 19, 1977, Manale and Orticke had an argument. Manale threatened to disclose "police misconduct" engaged in by Orticke while he was serving as a ranking officer in the Fifth District. An interdepartmental investigation followed, after which Manale was discharged for insubordination, untruthfulness and unfitness. Because Manale had been the Department's media representative, the discharge attracted substantial media attention. Manale pursued his civil service remedies and after a full hearing was reinstated with back pay in November of 1978. Later that month, Manale resigned, citing working conditions and a desire to return to college. Manale returned to Ocean Springs, Mississippi and enrolled at Jefferson Davis Junior College. He became a Mormon and late in 1979 moved to Provo, Utah and attended Brigham Young University. He began to experience physical and psychological problems. Suffering from persistent insomnia, unable to concentrate he consulted a general practitioner who referred him to a psychiatrist. The psychiatrist, Dr. Edward Faux, classified Manale as an obsessive-compulsive personality type. Although not undesirable, such a trait may, if the individual sustains a trauma which itself develops into an obsession, degenerate into a mental illness. Dr. Faux testified that the defendants' actions caused such a trauma and that Manale's prognosis for recovery was poor.
The trial court in Manale at 124 found that Sergeant Brewer engaged in a "continuous pattern of defamatory behavior ... These comments subjected Manale to both the ridicule and the suspicion of his fellow officers, causing him untold embarrassment and mental anguish." The court further stated:
"For defamatory words to be actionable under Louisiana law, Manale bore the burden of proving four elements: (1) publication, i.e. communication to some person other than himself; (2) falsity; (3) malice, actual or implied: and (4) resulting injury." (citations omitted)
The court found that "a little fruit", "gay", and "fruit" were defamatory words and that when Brewer called Manale those terms at police roll call in front of other police officers constituted the second element, publication. The court noted:
"Louisiana law distinguishes between statements only susceptible of a defamatory meaning and those that are defamatory "per se". It defines the latter type as those having a tendency to deprive a person of the benefit of public confidence or to injure him in his occupation or reputation. (citations omitted) Malice and falsity are presumed and the burden shifts to the defendant to rebut the presumption. (citations omitted) We have little difficulty in agreeing with the District Court that Brewer's statements *800 were defamatory per se. Having admitted that he made his comments without regard to their truth or falsity, Brewer utterly failed to carry his shifted burden.
With malice and falsity presumed, Manale had only to prove injury. The District Court concluded that he suffered psychological injuries as a result of the defamation. Although not capable of exact proof as to amount, such an injury suffices for purposes of Louisiana law. [FN.2] (citations omitted)"
The footnote to the passage above provides:
"`Without regard to proof of injury Louisiana has recognized that injury to reputation can result simply from the character of the defamatory words, though proof of pecuniary loss is impossible.' [Wilson v. Capital City Press,] 315 So.2d [393] at 397, citing Jozsa v. Moroney, 125 La. 813, 51 So. 908 (1910)."
In Manale, plaintiff was awarded $10,000 damages. The court stated:
"Although the award was small, it was not `unconscionably inadequate'. (citations omitted). Absent an abuse of discretion, which most definitely did not occur here, we will not disturb the damages figure on appeal."
CONCLUSION:
Just as the court in Manale found calling a man "a little fruit", "fruit", and "gay" defamatory per se, we find that calling a woman a "slut" is defamatory per se.
In reviewing the trial court's judgment and reasons therefor, we find no error in the trial court's finding of defamation. The trial court was clearly wrong in failing to find defendant liable for intentional infliction of emotional distress. The award of $1,500.00 was inadequate and an abuse of discretion. Under Reck v. Stevens, 373 So.2d 498 (La., 1979), we increase the award to $5,000.00, the lowest amount that could be awarded.
AMENDED and AFFIRMED.
SCOTT, C.J., dissents.
BARRY, J., concurs.
PLOTKIN, J., concurs with written reasons.
SCHOTT, Chief Judge, dissenting.
Plaintiff alleged in her petition that defendant defamed her on March 7, 1991, by referring to her as a "slut". After hearing the testimony of the plaintiff and her witnesses the trial judge awarded her $1,500 in damages. The trial judge gave extensive reasons for judgment including the following:
Considering all of the evidence it is obvious that plaintiff visited the night club in January of 1991 as she had related to the investigating professor. And on March 7, 1991, defendant, in returning practice examinations to the students of the Administration of the Criminal Justice class criticized them for doing poorly and commented that if they spent less time in bar rooms, becoming intoxicated and falling off bar stools, they would do better in examinations. Plaintiff, in the class at the time and in response to the comment stated, "why didn't you pick me up?" This invited a reply by the professor. What he said varies, depending upon which witness one tends to believe. What is certain in all the testimony of each witness is that after comments were exchanged, the defendant professor did, perhaps while turning aside, utter the word "Slut".
Save for this utterance, the plaintiff failed to prove that her reputation or esteem was lowered in the eyes of either her fellow students, the Faculty or the Staff of the Law Center. In fact, all the witnesses had and still do hold her in high esteem and feel that her reputation, despite the statements, is intact.
The chancellor of the school suggested to plaintiff that she forget the incident since the defendant did in fact apologize to plaintiff in front of the whole Class. She decided not to follow that suggestion and instead instituted this suit.
Six months following the incident and some three months after suit was filed, *801 plaintiff saw Dr. Lionel Guillant, a psychiatrist, whose testimony that plaintiff had a delayed distress disorder, is not impressive to this Court because his history was deficient in may aspects.... The Court does agree with the doctor that plaintiff has and had no thinking disorder.
Considering all evidence, together with the fact that defendant did not testify, this Court concludes that defendant did refer to plaintiff when he, unjustifiably, in a classroom, use the term "slut".
* * * * * *
The evidence does therefore justify an award and this Court feels that plaintiff will be adequately compensated by an award of $1,500.
In the brief plaintiff filed in this court she states the only issue is whether the $1,500 award in general damages is adequate for the injuries she sustained. In her assignments of error she takes issue with the trial court's findings that Dr. Guillaume was unimpressive and that she suffered no damage to reputation or loss of esteem among her peers. She asserts that the trial court failed to consider the embarrassment and humiliation she suffered.
The trial judge was able to see the witnesses plaintiff called and to hear their live testimony. Dr. Guillaume's testimony covers twenty-six pages of the transcript. My colleagues take out of this context a few isolated questions and answers from which they conclude the trial court was in error in his evaluation of Dr. Guillaume. When his testimony is read in its entirety one can readily conclude that the trial court was not clearly wrong in attaching little weight to his testimony.
The same goes for the trial court's treatment of plaintiff's claims for lost reputation and esteem and embarrassment and humiliation. These claims depended entirely on plaintiff's own testimony and that of a few of her classmates and friends. The weight to be given to this type of subjective testimony is the function of the trial court. My colleagues' conclusions that news of the incident spread through the law school "like wildfire", that plaintiff was the butt of jokes by her peers, that she withdrew from activities, and that she experienced mood and personality changes are all based upon their independent credibility evaluations of witnesses which are different than the trial court's.
My colleagues state that defendant called plaintiff a slut a second time in another class. Plaintiff did not allege this in her petition or in her brief in this court. This second incident came up during the trial, but when the trial judge questioned plaintiff about it she stated she had no witnesses to prove it. There is simply no evidence in the record to support my colleagues' finding of this second incident.
One of the reasons assigned by my colleagues for increasing the award is their finding that the trial court was clearly wrong in failing to find defendant liable for intentional infliction of emotional distress. The only place this tort was ever mentioned by plaintiff was in the caption of the original petition filed in the trial court. She does not mention this claim in her appellate brief. Consequently, this portion of the award by my colleagues is a gratuity granted by the court ex mero motu. This is a departure from normal appellate procedure.
However, even if this issue were properly before this court, in White v. Monsanto Co., 585 So.2d 1205, 1209 (La.1991) the court held that a plaintiff seeking recovery for intentional infliction of emotional distress must establish that 1) defendant's conduct was extreme and outrageous, 2) the emotional distress suffered by plaintiff was severe, and 3) defendant desired to inflict sever emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. These elements are not present in this case. Consequently, my colleagues' increase of the award to compensate plaintiff for this tort is without support as a matter of law.
In the portion of their opinion designated as "The Law" they cite only one case, a judgment of the United States Court of Appeals and conclude that the award made *802 in that case for defamation is somehow controlling in the instant case. To begin with a judgment of the federal court on a matter of state law has no binding effect on this court whatsoever. And while such an opinion might be persuasive under other circumstances the case cited by my colleagues in this case is practically irrelevant.
In order to conclude that a judgment for general damages an appellate court must first conclude that the trial court abused its great discretion in the amount of the award. Only then may the appellate court compare awards made in other cases for similar injuries. What my colleagues have done is to find one case and to say that the present plaintiff is entitled to recover a similar amount. This approach is clearly inconsistent with basic principles of appellate review. A litigant is not entitled to the same or similar award made in an isolated case. My colleagues fail to confine their amendment to the lowest amount within the range of discretion. Even if the federal Manale case were applicable, which it is not, since no other cases are cited, the notion of a range of discretion is ignored.
Finally, with all due respect for my colleagues, I submit that their reasons suggest a desire to punish defendant for his conduct. Punitive damages are not allowed in Louisiana for defamation. Ciecierski v. Avondale, 572 So.2d 834 (La.App. 4th Cir.1990), writ denied 574 So.2d 1256. Since plaintiff is entitled only to compensatory damages the increase is not justified on the basis of the record.
This case is not about whether or not the plaintiff was defamed or whether or not she is entitled to an award. The case is about the role of an appellate court in reviewing the amount of an award given by the trial court. The findings of fact are supported by the record. For the same reasoning followed by the court in Moreau v. Brennan, 466 So.2d 572, 574 (La.App. 5th Cir.1985) I submit that the award is not abusive of the great discretion vested in the trial court by LSA-C.C. art. 1999.
BARRY, Judge, concurs.
I agree that "slut" as used in this scenario, is defamatory per se. I would award $10,000 damages.
PLOTKIN, J., concurs with written reasons:
Although I agree with the majority's conclusion that the defendant in this case defamed the plaintiff by calling her a "slut" in a classroom situation, I disagree with the majority's simple statement that calling a woman a "slut" is always actionable as defamatory per se. That bold statement is not consistent with the legal reasoning on this issue established by a consideration of the relevant caselaw. Although the majority does not cite Louisiana jurisprudence on this issue, it is true that using words imputing "immorality or other traits or acts calculated to arouse hatred, ridicule, etc." is generally considered defamatory per se. Moreau v. Brenan, 466 So.2d 572, 574 (La. App. 1st Cir.1985). However, other jurisprudence from this circuit indicates that even words which are generally considered defamatory per se may not be considered sufficient to support an action for defamation under certain circumstances. See Becnel v. Boudreaux, 340 So.2d 687 (La.App. 4th Cir.1976). The court must always consider that context and the circumstances surrounding the alleged defamatory statement. Therefore, I would hold that the defendant in this case did indeed defame the plaintiff in this case by saying what he said in the way that he said it, without making sweeping statements about whether the same word might be actionable under other circumstances.
I am also concerned about the fact that the majority chooses to dramatically increase the plaintiff's damage award from the $1,500 awarded by the trial court to $5,000, without going through an analysis of the plaintiff's gross damages in this case, as required by Reck v. Stevens, 373 So.2d 498 (La.1979). Initially, I would note that the $5,000 award given by the majority is more than twice the highest damage award for defamation cited by the plaintiff's own brief. That said, I would also *803 agree that under the egregious circumstances of this particular case, I believe that the increased award is nevertheless appropriate.
I would justify this conclusion by pointing out that the facts of this case were especially egregious. The defendant in this case was a law professor, entrusted with the legal education of both the plaintiff and many of her peers, all of whom undoubtedly regarded the defendant with some respect because of his position at the law school. Against that background, the defendant chose to engage in a personal attack on one of his students in crowded classroom setting, where the potential for publication is guaranteed. Predictably, the defendant's statements swept through the university like wildfire, reaching virtually all the members of an insular, closed environment, where the plaintiff was very vulnerable, both personally and professionally. The defendant's behavior was certainly unusual for a law professor, and his accusation apparently came to the attention of the whole law school. The damages suffered by the plaintiff were myriad, encompassing both personal and professional areas, as evidenced by the testimony in the record, which is uncontested. Additionally, the plaintiff did seek medical treatment. She obviously suffered severe embarrassment and mental anguish. Under the circumstances, I agree that the lowest reasonable amount of damages is $5,000.