ROSEMARY LEDET, Judge.
11 This is a defamation case. This case arises out of litigation in which the plaintiff, Madro Bandaries, and the defendants, F. Evans Schmidt and his law firm (Koch and Schmidt, LLC) (collectively “Mr. Schmidt”), were opposing counsel. Mr. Bandaries alleges that Mr. Schmidt defamed him at a deposition by posing offensive questions to the deponent, Judith Sullivan. Ms. Sullivan was both Mr. Ban-daries’ wife and the plaintiff in the underlying suit. Mr. Bandaries and his associate were both Ms. Sullivan’s attorneys in the underlying suit. The gist of the offensive questions was that Mr. Bandaries and his associate were having an affair — “having a sexual relationship.” From the trial court’s judgment granting Mr. Schmidt’s motion for summary judgment, Mr. Ban-daries appeals. For the reasons that follow, we reverse and remand for further proceedings.
FACTUAL AND PROCEDURAL BACKGROUND
From December 2011 until November 2012, Ms. Sullivan was a resident of Malta Park, a former assisted living facility located in New Orleans, Louisiana. In November 2012, Mr. Bandaries, in his capacity as Ms. Sullivan’s husband-caregiver,2 removed her, for her safety, from Malta Park and placed her at another assisted living facility, St. Francis Villa Assisted Living (“St. Francis”). In February 2013, Ms. Sullivan and another named plaintiff commenced a suit, entitled Sullivan v. Malta Park, et al., in Orleans Parish Civil *1202 District Court (“CDC”), No. 13-1355 (the “Sullivan Suit ”).[1] The named defendants included, among others, Malta Park.[2] In their original petition, the plaintiffs asserted tort and contract claims arising out of the deficient care Malta Park provided to them while they were residents there.[3] Ms. Sullivan also asserted that the Malta Park Defendants had fraudulently attempted to seek extra funds from her by reassessing her at a higher level of care. Mr. Bandaries and his associate, M. Claire Trimble, both members of Madro Bandaries, PLC, signed the original petition as the plaintiffs’ attorneys.
Mr. Schmidt represented the Malta Park Defendants in the Sullivan Suit. In that capacity, he noticed Ms. Sullivan’s deposition. On October 7, 2013, Mr. | ¡¡Schmidt took Ms. Sullivan’s deposition at St. Francis. Present at the deposition were the following people: (i) Mr. Schmidt, Malta Park’s lead attorney; (ii) Caitlin Morgenstern, Mr. Schmidt’s associate and another attorney for Malta Park; (iii) Ms. Trimble, Ms. Sullivan’s attorney and Mr. Bandaries’ associate; and (iii) Mr. Bandar-ies, Ms. Sullivan’s husband-caregiver and also her attorney. Mr. Bandaries was present at the deposition in his capacity as caregiver, not as attorney. At the conclusion of the deposition, the following colloquy occurred between Mr. Schmidt and Ms. Sullivan, which is the basis for this lawsuit:
Q. [Mr. Schmidt] Do you know who this lady is next to you?
A. [Ms. Sullivan] Yes
Q. [Mr. Schmidt] Who’s that?
A. [Ms. Sullivan] My husband’s partner.
Q. [Mr. Schmidt] Now, did you talk to her about bringing this lawsuit?
A. [Ms. Sullivan] I don’t remember.
Q. [Mr. Schmidt] Okay. Did she talk to you about the lawsuit?
A. [Ms. Sullivan] I don’t remember.
Q. [Mr. Schmidt] Okay. Has Ms. Trim-ble ever talked to you about her having a sexual relationship with your husband?
A. [Ms. Sullivan] No.
MR. BANDARIES:
Hold on. Now, I don’t know where you got that or even — but mark that because I’m going to take it before the judge, okay?
MR. SCHMIDT:
That’s fine.
MR. BANDARIES:
|4Okay. We’re going to do that. That’s so far off the reservation it’s un *1203 believable. Okay. Mark it, ma’am, and I want a copy of that deposition.
Q. (BY MR. SCHMIDT) Has your husband ever talked to you about having a sexual relationship with Ms. Trimble?
A. [Ms. Sullivan] No.
Q. [Mr. Schmidt] and you have no knowledge of that.
A. [Ms. Sullivan] No.
Q. [Mr. Schmidt] Okay. I have no other questions.
(Whereupon the deposition was concluded.)
In November 2013, Mr. Bandaries commenced this defamation suit against Mr. Schmidt.[4] In his petition, he averred that the basis for the suit was the above-quoted series of questions, which he stated “were not related to the substance of the lawsuit.” He further averred:
• This line of questioning had absolutely no relationship to any fact relevant to the lawsuit for which the deposition was taken; further, the line of questioning could not lead to any fact relevant to the lawsuit. There was no reason to believe that the issue of whether TRIMBLE or BANDARIES had ever talked to SULLIVAN about a sexual relationship was related in any way to SULLIVAN’S litigation.
• Plaintiff states that he has never had a sexual relationship with TRIMBLE.
• On information and belief plaintiff states that the purpose of the line of questioning was to embarrass and humiliate plaintiff in front of his wife.
h* As a result of these statements the relationship between SULLIVAN and BANDARIES has been damaged irrevocably. SULLIVAN is disabled, but she fully understood the allegation that SCHMIDT made to her.
• Further, this information was made known to everyone at the deposition that date, and was included in the deposition which was taken for all purposes, according to the stipulation. BANDARIES is an attorney in good standing in the State of Louisiana, and his reputation was impugned by these statements, heard by other members of the legal community. His reputation was therefore damaged.
• The questions asked by SCHMIDT were made with actual malice, in that those statements were made with knowledge that they were false or with reckless disregard of whether those statements were false.
• The statements which alleged an adulterous relationship between the husband of the deponent and his law partner are defamatory per se.
In December 2013, Mr. Schmidt answered the suit and asserted the affirmative defense of qualified immunity. In February 2014, Mr. Schmidt filed a motion for summary judgment or an alternative exception of no cause of action. In support of the motion, Mr. Schmidt enumerated the following statement of uncontested facts:
*1204 • [Mr.] Bandaries is- an attorney of record for Ms. Sullivan and Mr. Thomson in the original lawsuit [the Sullivan Suit ]. He is also the husband of Ms. Sullivan. Mr. Bandaries also holds Ms. Sullivan’s power of attorney to make financial decisions on her behalf.
• [Mr.] Bandaries’ associate, M. Claire Trimble, was also attorney of record for the plaintiffs in the original law suit. Ms. Trimble holds a power of attorney to make medical and health decisions in her behalf.
• In advance of the filing of the original litigation, [Mr.] Bandaries and [Ms.] Trimble both interacted with Malta Park personnel with regard to Ms. Sullivan’s care while at Malta Park.
• In advance of the filing of the original litigation, [Mr.] Bandaries and [Ms.] Trimble were both present at meetings between Ms. Sullivan and Malta Park personnel.
• On behalf of the defendants in the original law suit, [Mr.] Schmidt properly noticed the deposition of Judith Sullivan, which went forward on October 7, 2013.
• The line of questioning which purportedly gives rise to the Bandaries suit for defamation is [quoted above in this opinion].
• Ms. Sullivan testified that she left Poy-dras Home [the assisted living facility where she resided before being moved to Malta Park] because the price of care there increased.
• Ms. Sullivan testified that Ms. Trimble was not her caretaker, that she did not know if Ms. Trimble was her lawyer, and that Ms. Trimble was her husband’s “partner.”
In opposition to the motion for summary judgment, Mr. Bandaries submitted a preliminary report from Edward Halie Shwery, Ph.D, a clinical and forensic psychologist, who examined Ms. Sullivan.
On March 28, 2014, a hearing, was held on the motion for summary judgment. Following the hearing, the trial court granted Mr. Schmidt’s motion for summary judgment, but denied his motion to strike Dr. Shwery’s report, which was an attachment to Mr. Bandaries’ opposition to the motion for summary judgment. The report was introduced into evidence at the hearing over Mr. Schmidt’s objection. In its judgment, the trial court referenced the “reasons orally assigned” as the basis for its decision. At the hearing, the trial court provided the following oral reasons:
How do you get a claim for defamation in, when, in a lawsuit, lawyers are asking questions consistent with the Code which may lead to admissible evidence. How do you get a claim for defamation where you then turn around as a result of those questions in that lawsuit essentially sue the lawyer for asking questions.
[[Image here]]
How do you get to [a] defamation claim ... I really don’t see it and as a matter of fact what I see is a chilling affect [sic] relative to [a] lawyer’s ability to do appropriate discovery, if a question is questionable, that means that the lawyer doesn’t ask it, or does it |7simply mean that a good lawyer on the other side simply objects to it and says I am instructing my client not to respond to that and I’m asking you not to go down this line of questioning.
[[Image here]]
I’m not suggesting to you that every question is appropriate, what I’m questioning is whether or not if a question, it just so happen in this particular case that we have an attorney who also represents his wife, who is in the room at the time the questioning is being asked. The real question becomes, when lawyers ask questions of opponent, does ...
*1205 I don’t see a valid defamation claim under these circumstances such that it’s not more so a chilling affect [sic] relative to [a] lawyer’s ability to vigorously represent their client. I’m not suggesting to you that the question shouldn’t have perhaps been objected to.
The trial court thus found that the questions may have been unprofessional, but they were not defamatory. This appeal followed.
STANDARD OF REVIEW
“Some attorneys combine the exception of no cause of action and the motion for summary judgment to obtain the pretrial disposition of claims which need not be tried on the merits.” 1 Frank L. Maraist and Harry T. Lemmon, LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE § 6:7, n. 51 (1999). An exception of no cause of action and a motion for summary judgment are complementary procedural devices; however, there are differences between them. Id. The principal difference is that evidence can be introduced to decide a motion for summary judgment, but not to decide an exception of no cause of action. Id. In this case, Mr. Schmidt’s attorney filed both procedural devices. The trial court, however, ruled only on the motion for summary judgment, which it granted.
This court recently summarized the general standard of review of a trial court’s ruling granting a motion for summary judgment, pursuant to La. C.C.P. arts. 966 and 967 and the jurisprudence, in Mandina, Inc. v. O'Brien, 13-0085 (La.App. 4 Cir. 7/31/13); 156 So.3d 99, 104-05, writ denied, 13-2104 (La.11/22/13), 126 So.3d 485, as follows:
Appellate courts review the grant or denial of a motion for summary judgment de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. This standard of review requires the appellate court to look at the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, to determine if they show that no genuine issue as to a material fact exists, and that the mover is entitled to judgment as a matter of law. A fact is material when its existence or nonexistence may be essential to the plaintiffs [sic] cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, no need for trial on that issue exists and summary judgment is appropriate. To affirm a summary judgment, we must find reasonable minds would inevitably conclude that the mover is entitled to judgment as a matter of the applicable law on the facts before the court.
The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of actions. Summary judgments are favored, and the summary judgment procedure shall be construed to accomplish these ends. The code provides that where [as in the instant case] the party moving for summary judgment will not bear the burden of proof at trial, their burden does not require them to negate all essential elements of the adverse party’s claim, but rather to point out to the court that an absence of factual support exists for one or more elements essential to the adverse party’s claim. Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial, no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. *1206 The adverse party cannot rest on the mere allegations or denials of his pleadings when a motion for summary judgment is made and supported by affidavits, but is required to present evidence establishing that material facts are still at issue.
In Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 25, n. 17 (La.7/10/06), 935 So.2d 669, 686, the Louisiana Supreme Court reexamined the principle that an elevated summary judgment standard applied in defamation cases, stating:
In Sassone v. Elder, 626 So.2d 345 (La.1993), we held that the summary judgment standard is different in defamation cases than in other cases; in order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial.
Since our decision in Sassone, the legislature has amended the summary judgment articles, 1996 La. Acts, 1st Ex. Sess., No. 9, with the result that summary judgment is now favored, thereby eliminating the need for courts to impose a different summary judgment standard in defamation cases. Nevertheless, the considerations that make defamation actions particularly susceptible to summary judgment remain the same.[5]
DISCUSSION
Mr. Bandaries’ sole assignment of error is that the trial court erred in granting the defendants’ motion for summary judgment. To decide whether a motion for summary judgment was properly granted, reference must be made to the applicable substantive law. Kline v. Farm Bureau Ins. Companies, 06-129, p. 6 (La.App. 5 Cir. 9/26/06), 942 So.2d 1080, 1083 (noting that “[b]ecause it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case.”)
In Louisiana, civil liability for defamation is based upon a violation of the general tort article, La. C.C. art. 2315. 12 Ferdinand Stone, LOUISIANA CIVIL LAW TREATISE: TORT DOCTRINE, § 176 (1977). This court in Thompson v. Bank One of Louisiana, NA, 13-1058, pp. 10-11 (La.App. 4 Cir. 2/26/14), 134 So.3d 653, 661, writ denied, 14-0793 (La.6/30/14), 148 So.3d 182, noted that the applicable principles regarding a defamation cause of action are as follows:
The Louisiana Supreme Court has described the tort of defamation as the invasion of a person’s interest in his or her reputation and good name. Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 4 (La.7/10/06), 935 So.2d 669, 674 (citing Costello v. Hardy, 03-1146, p. 12 (La.1/21/04), 864 So.2d 129, 139). Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another, (2) an unprivileged publication to a third party, (3) fault (negligence or greater) on the part of the publisher, *1207 and (4) resulting injury. Id. The fault requirement is generally considered to be malice, actual or implied. Id. By definition, a statement is defamatory if it tends to harm a person’s reputation, lowers the person in the estimation of the community, deters others from associating with the person, or otherwise exposes the person to contempt or ridicule. Id.
Assuming a plaintiff makes a prima facie showing that he or she can satisfy the essential elements of a defamation cause of action, “recovery may be precluded if the defendant shows either that the statement was true, or that it was protected by a privilege, absolute or qualified.” Costello v. Hardy, 03-1146, p. 15 (La.1/21/04), 864 So.2d 129, 141 (citing Doe v. Grant, 01-0175, p. 9 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 416; Arledge v. Hendricks, 30,588, p. 4 (La.App. 2 Cir. 6/26/98), 715 So.2d 135, 139). In this case, Mr. Schmidt, as Mr. Bandaries points out, did not allege in his statement of uncontested facts that the alleged defamatory communications—the statements in the questions he posed— were true. Mr. Schmidt, however, did assert the qualified privilege in his answer. Moreover, the trial court, in its oral reasons for judgment, implicitly relied on the qualified privilege to grant Mr. Schmidt’s motion for summary judgment. We thus begin our analysis by addressing the issue of whether qualified privilege applies in this case.
The qualified privilege
|nA qualified privilege is an affirmative defense to a cause of action for defamation, which must be specially pled in a defendant’s answer. Costello, 031146, p. 16, n. 13, 864 So.2d at 142; La. C.C.P. art. 1005. As noted, Mr. Schmidt affirmatively pled qualified immunity in his answer. The issue of whether the qualified privilege applies is thus properly before us.
Unlike in other jurisdictions, attorneys in Louisiana are afforded only a qualified—not an absolute—privilege for statements made in the course of litigation. Freeman v. Cooper, 414 So.2d 355, 359 (La.1982) (noting that “[i]n other jurisdictions, a defamatory statement by an attorney in a judicial proceeding is absolutely privileged, if the statement has some relation to the proceeding,” but in Louisiana the privilege is a qualified one); 1 Robert D. Sack, SACK ON DEFAMATION § 8:2.1 (4th ed. 2013) (noting that “in Louisiana, at the opposite pole, litigants are accorded only a conditional privilege”).
The statutory basis for the qualified privilege in Louisiana is codified in La. R.S. 14:49, which provides:
A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:
(1) Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same.
“Although La. R.S. 14:49 is part of the Louisiana Criminal Code, the qualified privileges that it enumerates as defenses for criminal defamation ... are also applicable to civil defamation cases.” Hornot v. Cardenas, 06-1341, p. 21 (La.App. 4 Cir. 10/3/07), 968 So.2d 789, 803 (citing Reporter’s Comments-1959 to La. R.S.14:47 and the cases cited in the comments).
112This court, in Miskell v. Ciervo, 557 So.2d 274 (La.App. 4th Cir.1990), addressed the issue of the qualified privilege set forth in La. R.S. 14:49; stating:
[A] defamation action is barred by the principle of qualified privilege in favor of attorneys regarding the pleadings and briefs which they file. The reasoning for such a holding has not altered: to *1208 allow any defamation action based upon potentially offensive, albeit justifiable, statements would serve to invite a flood of litigation. Any such statement, whether proven or not, would become actionable. Comment I to Rule 1.3 of the American Bar Association Model Rules of Professional Conduct states that “[A] lawyer should act with commitment and dedication to the interest of the client and with zeal in advocacy upon the client’s behalf.” (emphasis added). If an attorney is afraid of the consequences which may flow from using possibly offensive statements, he can no longer represent his client with the “zeal” called for in the Model Rules.
However, this does not give the attorney free rein to make outlandish and unwarranted statements.... Furthermore, the Supreme Court held that “an attorney in Louisiana cannot make disparaging statements, either in pleadings, briefs or arguments, if the defamatory statements are not pertinent to the case or are made maliciously or without reasonable basis.” Freeman v. Cooper, 414 So.2d 355, 359 (La.1982).
Miskell, 557 So.2d at 275; see also Jacobs v. O’Bannon, 472 So.2d 180 (La.App. 4th Cir.1985) and Jacobs v. O’Bannon, 531 So.2d 562 (La.App. 4th Cir.1988).
Determining whether a qualified privilege applies involves the following two-step process: (i) determining whether the attending circumstances of a communication occasion a qualified privilege; and (ii) determining whether the privilege was abused, which requires that the grounds for abuse — malice or lack of good faith— be examined. The first step generally is decided as a matter of law; whereas, the second step generally is a question of fact for the jury unless only one conclusion can be drawn from the evidence. Dyas v. Shreveport Police Dep’t, 48,804, p. 10 (La.App. 2 Cir. 2/26/14), 136 So.3d 897, 904 (citing Kennedy v. Sheriff of E. Baton Rouge, 05-1418, pp. 17-18 (La.7/10/06), 935 So.2d 669, 682); see also Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 18 (La.7/5/94), 639 So.2d 730, 745.
The circumstances that fall within the qualified privilege for attorneys were outlined by the Louisiana Supreme Court in Freeman case, which held that statements made in the course of a judicial proceeding are subject to a qualified privilege if the statements satisfy the following three requirements: (i) are material to the proceeding, (ii) are made with probable cause, and (iii) are made without malice. Mr. Bandaries contends that the qualified privilege does not apply to Mr. Schmidt’s statements (questions) because they were not material, pertinent, or relevant to the underlying case; were made with malice; and were made without a reasonable basis.
Mr. Schmidt counters that the questions were “potentially offensive” but justifiable. He contends that the questions were posed as part of his “zealous representation” of his clients, the Malta Park Defendants. In support, he cites Freeman for the proposition that “an attorney must be free to allege facts constituting unacceptable behavior if there is any reasonable basis for such an allegation and if the behavior is relevant to the proceeding.” 414 So.2d at 359. In an attempt to establish the questions (statements) were relevant to the proceeding and thus justifiable, Mr. Schmidt posits three reasons for the questions.
The first reason Mr. Schmidt posits is that the multiple roles both Mr. Bandaries and Ms. Trimble played in decision making as to Ms. Sullivan made an inquiry into the tripartite relationship among them relevant. He contends that the questions were directed to the motivation for Ms. Sullivan’s caretaker-financial manager’s (Mr. Bandaries’) efforts to reduce the cost *1209 of her care. Indeed, Mr. Schmidt notes that Mr. Bandaries played at least four roles; he was Ms. Sullivan’s [14husband, counsel, caregiver, and financial manager. Moreover, Mr. Schmidt notes that both Mr. Bandaries and Ms. Trimble held a power of attorney for Ms. Sullivan and that they were both present at meetings with Malta Park personnel. One or both controlled Ms. Sullivan’s assets. They both were involved in challenging Malta Park personnel’s assertion that Ms. Sullivan’s level of care, and the attendant cost of that care, needed to be increased. For these reasons, Mr. Schmidt contends that the nature of the relationship among the trio was highly relevant to the motivation for seeking less expensive care for Ms. Sullivan.
The second reason Mr. Schmidt posits is that the questions were directed at the potential conflict of interest resulting from the relationship between Mr. Bandaries and Ms. Trimble. He contends that his investigations “brought to light potential unethical behavior on the part of Bandar-ies and Trimble that posed a serious conflict of interest and ethical risk to their continued representation of Sullivan.”
The third reason Mr. Schmidt posits is that the questions were follow-up questions related to Ms. Sullivan’s initial inability to identify Ms. Trimble as her lawyer and to Ms. Sullivan’s reference to Ms. Trimble as her husband’s “partner” — a “term in today’s parlance can mean any number of things.” Mr. Schmidt contends that the questions were to illicit further information from Ms. Sullivan. He notes that Ms. Sullivan testified she left Poydras Home — the assisted living facility where she resided before Malta Park — because it was too expensive rather than because the care was poor. Ms. Sullivan denied that Ms. Trimble was her caregiver. Ms. Sullivan was unable to tell Mr. Schmidt whether Ms. Trimble was her lawyer or whether Ms. Trimble had spoken to her about bringing the lawsuit against Malta Park. Mr. Schmidt contends that he then rephrased the 11squestion and asked Ms. Sullivan if she knew the lady who was sitting next to her. In response, Ms. Sullivan stated that Ms. Trimble was her husband’s “partner.” Given the context, Mr. Schmidt contends the questions were reasonable follow-up questions.
For these three reasons, Mr. Schmidt contends that the trial court correctly found the questions were pertinent and that the qualified privilege applied. He further contends that the finding that the privilege applies obviates the need to consider Mr. Bandaries’ other arguments.
Contrary to Mr. Schmidt’s contention, we find the questions were palpably irrelevant to the underlying litigation. As Mr. Bandaries’ counsel pointed out at the hearing, Ms. Sullivan’s damage claim in the underlying suit did not include any damages relative to her relationship with Mr. Bandaries. There was no loss of consortium claim urged by Mr. Bandaries or Ms. Sullivan in the original petition in the Sullivan Suit. Whether Mr. Bandaries and his associate were having an affair has no potential relevance to the issues presented in the Sullivan Suit We thus find that the first requirement for the application of the qualified privilege — that the statements are material to the proceeding — is not satisfied and that the qualified privilege thus does not apply.
Our finding is bolstered by the holding in Stahl v. Kincade, 135 Ind.App. 699, 192 N.E.2d 493 (1963). In Stahl, the underlying suit was a property dispute — a nuisance and trespass suit seeking to enjoin the defendant from maintaining a “public basketball playground” next to the plaintiffs property. The plaintiff and the defendant were neighbors. The alleged defamatory statement was made in *1210 the defendant’s counterclaim seeking in-junctive relief based on the plaintiffs alleged adulterous relationship with a police officer. Finding the defamatory statement was 11 (¡palpably irrelevant to the underlying suit, the court concluded that “[i]n the present case the matter alleged in the purported counterclaims was not relevant or pertinent to the matter in controversy and had no relation thereto. It may be reasonably inferred from the facts pleaded that appellees did not have reasonable or probable cause to believe the matter to be relevant or pertinent.” Stahl, 135 Ind.App. at 708, 192 N.E.2d at 497. The Stahl court thus held that the absolute litigation privilege was inapplicable. The rationale behind the holding in Stahl was that “[a] determination of whether to enjoin the defendants from maintaining a basketball court would not have prompted an inquiry at trial into the plaintiffs social behavior.” Chrysler Motors Corp. v. Graham, 631 N.E.2d 7, 10 (Ind.Ct.App.1994) (distinguishing the Stahl case).
In this case, we find the rationale in Stahl buttresses our finding that the qualified privilege is inapplicable. Determining whether an assisted living care facility was providing deficient care or fraudulently seeking to increase the cost of the plaintiffs care would not have prompted an inquiry at trial into the plaintiffs spouse-attorney’s social behavior. We thus find that the qualified privilege is not applicable. Given our finding that the affirmative defense of qualified privilege is inapplicable, we turn to the issue of whether Mr. Bandaries has established the elements of a defamation cause of action.
Defamation cause of action
In this case, the alleged defamatory statements are the two questions that Mr. Schmidt posed to Ms. Sullivan at the end of her deposition. A preliminary issue, which Mr. Schmidt raised in his motion and the trial court voiced at the hearing, is “how does posing a question lead to defamation?” Mr. Schmidt’s argument was that the questions were incapable of being actionable because they did not | ^constitute a statement or allegation about Mr. Bandaries; rather, he argued that “[t]hey were inquires, which by their very nature cannot be characterized as either ‘false’ or ‘true.’” Mr. Bandaries counters that the statements, although “cloaked as questions,” were phrased as affirmative statements and thus actionable. According to Mr. Bandaries, the questions were fashioned in such a way that the “sexual relationship” comments were presupposed to be true. He contends that the questions were akin to the proverbial, inappropriate “when did you stop beating your wife” type question. We agree.
The jurisprudence has recognized that “[t]he form of the language used is not controlling, and there may be defamation by means of a question.” Dan B. Dobbs, Robert E. Keeton, & David G. Owen, PROSSER AND KEETON ON THE LAW OF TORTS, § 111 (5th ed. 1984). To be actionable, “a question must be reasonably read as an assertion of a false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation.” 50 Am.Jur.2d Libel and Slander § 154 (2006) (citing Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1094 (4th Cir.1993)). Stated otherwise, “if a statement of fact is in the form of a rhetorical question, it may be actionable. If it reflects, instead, a search for information, a rhetorical statement of opinion, or a report of an open or possible question, liability would be inappropriate.” 1 Robert D. Sack, SACK ON DEFAMATION § 2:4.8 (4th ed. 2013). Applying these principles, we find the deposition questions Mr. Schmidt posed to Ms. Sullivan were phrased as affirmative statements about Mr. Bandaries and thus may be actionable words.
*1211 “The threshold issue in a defamation action is whether the words complained of are defamatory, i.e., capable of a defamatory meaning.” Costello, 03-1146 at p. 15, 864 So.2d at 141. The determination of whether particular words 118have a defamatory meaning is ultimately a legal question for the court. Costello, 2003-1146 at p. 13, 864 So.2d at 140. An established principle of Louisiana law is that “the court, in making its determination whether the words are defamatory, must look not only to the words themselves but to the context and circumstances in which they were used.” Becnel v. Boudreaux, 340 So.2d 687, 688 (La.App. 4th Cir.1976) (collecting cases).
Defamatory words in Louisiana are divided into two types: defamatory per se and words that are susceptible of a defamatory meaning. Summarizing the jurisprudence on this issue, this court in the Thompson case stated as follows:
In Louisiana, defamatory words have traditionally been divided into two categories. First, words that are defamatory per se are those which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one’s personal or professional reputation, without considering extrinsic facts or circumstances. When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed. The second type of defamatory words are words that are susceptible of a defamatory meaning. In that case, a plaintiff must prove, in addition to a defamatory meaning and publication, falsity, malice (or fault) and injury. Kennedy, 05-1418 at p. 5, 935 So.2d at 674-75.
Thompson, 13-1058 at p. 11, 134 So.3d at 661-62.
Mr. Bandaries avers in his petition that “[t]he statements which alleged an adulterous relationship between the husband of the deponent and his law partner are defamatory per se.” He emphasizes that the underlying case was not a divorce proceeding between two contentious spouses in which the attorneys were maligning each other. Rather, he characterizes the underlying case as a personal injury case in which an attorney representing a corporation decided to inform the plaintiff that her husband was having an affair. He cites the principle, noted above, that the court must take into account the context in which the statements were 119made. Viewed in context, he contends that the purpose of the attorney’s statement could only be to damage the husband’s personal reputation.[6]
Mr. Schmidt counters that the statements (the questions) were not defamatory per se. He emphasizes that he neither accused Mr. Bandaries of committing a crime nor attacked his personal reputation as an attorney. Alternatively, Mr. Schmidt contends that, even if the statements could be read as attacking Mr. Ban-daries’ reputation, the statements were not sufficiently outrageous to be deemed defamatory. Mr. Schmidt further contends that, even assuming the questions contained actionable statements regarding a sexual relationship between Ms. Sullivan’s attorneys, “Louisiana law simply does not recognize any cause of action for words or speech which constitute the allegation of an extramarital affair.” In support of this statement, Mr. Schmidt cites Price v. *1212 Fuerst, 09-545 (La.App. 3 Cir. 11/4/09), 24 So.3d 289.
Mr. Schmidt’s reliance on the Price case is misplaced. The holding in Price is much narrower than Mr. Schmidt contends; the holding is that “Louisiana law does not recognize a cause of action for intentional infliction of emotional distress based solely on allegations of an extramarital affair. The cause of action is similar to one for alienation of affection which has never been actionable in Louisiana.” Price, 09-545 at p. 2, 24 So.3d at 290. As Mr. Bandaries points out, this case does not involve a claim for the breakup of a marriage; thus, unlike the Price case, this is not an alienation of affection case.[7]
12f)The alleged defamatory statements accuse Mr. Bandaries of adultery — having a sexual relationship with his associate. “Statements imputing sexual impropriety have commonly been found to be defamatory [by Louisiana courts].” Howard v. Town of Jonesville, 935 F.Supp. 855, 861, n. 4 (W.D.La.1996) (citing Moreau v. Brenan, 466 So.2d 572, 574 (La.App. 5th Cir.1985) (allegation that wife was having extramarital relations constituted defamation per se); Gorman v. Swaggart, 524 So.2d 915, 921 (La.App. 4th Cir.1988) (statements imputing adultery are defamatory); Smith v. Atkins, 622 So.2d 795, 800 (La.App. 4th Cir.1993) (calling a woman a “slut” is defamatory per se)); see also Rachal v. State, Dep’t of Wildlife & Fisheries, 05-576, p. 5 (La.App. 3 Cir. 12/30/05), 918 So.2d 570, 575 (finding a report imputing two officers, one of whom was married, had sex while on duty was defamatory per se); McAlpin v. State, Dept. of Wildlife & Fisheries, 05-577 (La.App. 3 Cir. 12/30/05), 918 So.2d 576 (companion case to Rachal). The jurisprudence is consistent with the Restatement (Second) of Torts § 574 (1977), which states that “[o]ne who publishes a slander that imputes serious sexual misconduct to another is subject to liability to the other without proof of special harm.”
In Gorman, this court equated statements imputing adultery or extramarital sexual relations with statements imputing a crime; and we stated that both types of statements are defamatory. 524 So.2d at 921 (citing Moreau, supra). We thus 121implicitly found an accusation of adultery is defamation per se. Other jurisdictions have likewise recognized that “an accusation of adultery is defamatory per se.” McFarland v. McFarland, 684 F.Supp.2d 1073, 1086 (N.D.Iowa 2010) (citing Gorman, supra, and Arnold v. Lutz, 141 Iowa 596, 598, 120 N.W. 121, 121 (1909)). In the McFarland case, the court noted that “[although the Arnold decision was handed down over a century ago, the court has no doubt that its holding remains as viable today as the day it was rendered given that a number of other states continue to view allegations of adultery as defamatory per se.”[8] Applying these principles, we *1213 find, agreeing with Mr. Bandaries, that Mr. Schmidt’s statements, accusing Mr. Bandaries of adultery, were defamatory per se.
The second element a plaintiff must prove to establish a defamation cause of action is an unprivileged publication to a third party. Sommer v. State, Dep’t of Transp. & Dev., 97-1929, p. 26 (La.App. 4 Cir. 3/29/00), 758 So.2d 923, 939 (holding that “[t]o be actionable, the words must be communicated or published to someone other than the plaintiff.”). Mr. Bandaries avers in his petition that there was publication in this case because “this information was made known to everyone at the deposition that date, and was included in the deposition which was taken for all purposes, according to the stipulation.” On appeal, Mr. Bandaries contends that, assuming the qualified privilege is not applicable (which we conclude above), “the court reporter and Ms. Sullivan are both there to hear the allegation.”
Mr. Schmidt counters that the questions were not published because “[t]hey were asked within the confines of a deposition as part of litigation where only the litigants, the lawyers, and the court reporter were present.” He contends that Mr. Bandaries cannot meet his burden of establishing the statements were published because his speech was privileged and because the communication was not offered outside the confines of the litigation. The sole basis for Mr. Schmidt’s argument that the statements (questions) were not published is the qualified privilege. Given our finding that the qualified privilege is inapplicable, we find the element of publication was satisfied.
When a plaintiff proves publication of defamatory per se statements, the essential elements of falsity, injury, and malice (or fault) are presumed; however, the defendant may rebut the presumption. Arledge, 30-588 at p. 4, 715 So.2d at 138; Costello, 03-1146 at 14, 864 So.2d at 140. Given our finding that the quali *1214 fied privilege is inapplicable, that the statements were defamatory per se, and that there was a publication, the burden shifted to Mr. Schmidt to rebut the presumption. Mr. Schmidt, however, introduced no evidence in support of his motion for summary judgment. Indeed, the only evidence introduced at the summary judgment hearing | ^was the report of Dr. Shwery, which Mr. Bandaries introduced. Based on our de novo review, we thus find the trial court erred in granting Mr. Schmidt’s motion for summary judgment.
As a final point, we address Mr. Schmidt’s contention that the trial court erred in allowing, over his objection, Dr. Shwery’s report to be introduced. The trial court’s ruling on this issue was contained in its judgment, which included a ruling in favor of the plaintiff, Mr. Bandar-ies, on Mr. Schmidt’s Motion to Strike Dr. Shwery’s report. Since Mr. Schmidt failed to file an answer to the appeal, we find this issue is not properly before us. See La. C.C.P. 2133 A (providing “[a]n appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant.”). This issue is therefore not properly before us on appeal. Regardless, we note that the report had no impact on our decision.

DECREE

For the foregoing reasons, the judgment of the trial court is reversed. This matter is remanded for further proceedings.
REVERSED AND REMANDED

. In the original petition in the Sullivan Suit, Ms. Sullivan averred that she was represented by a power of attorney appointing Mr. Ban-daries as her attorney in fact and caregiver and granting him "full power and authority and in her name and behalf” to "conduct, manage and transact all and singular her affairs.”

. For ease of discussion, the defendants in the Sullivan Suit are referred to collectively as the "Malta Park Defendants."

. In the Sullivan Suit, the plaintiffs asserted the following causes of action: (1) fraud in the inducement, (2) strict liability pursuant to La. C.C. art. 2317.1, (3) failure to exercise reasonable and ordinary care over the premises, (4) negligent hiring, (5) a Louisiana Unfair Trade Practice Act claim, (6) breach of state law as to the administration of drugs to residents, (7) breach of fiduciary duty, (8) mental anguish, (9) invasion of Ms. Sullivan’s right to privacy, (10) unjust enrichment, (11) fraud, (12) negligent misrepresentation, (13) conspiracy, (14) detrimental reliance, (15) conversion, (16) duty to exercise reasonable care as to the premises, and (17) respondeat superior. The plaintiffs also asserted that their action satisfied the requirements for maintaining a class action and that the proposed class would be defined as Malta Park residents "who entered into contracts of service with MALTA PARK and did not receive the contract services promised by MALTA PARK.”

. On October 15, 2013, Ms. Sullivan amended her petition in the Sullivan Suit to join as additional defendants Mr. Schmidt and his alleged insurer, Old Republic Insurance Company, and to add an intentional infliction of emotion distress ("IIED”) claim against all the defendants. The trial court granted the defendants’ motion to consolidate this defamation suit with the Sullivan Suit. On March 5, 2014, the trial court rendered judgment granting the Malta Park Defendants’ and Mr. Schmidt’s peremptory exception of no cause of action, dismissing the IIED claim and dismissing Mr. Schmidt as a defendant. Ms. Sullivan’s appeal of the March 5, 2014 judgment is the subject of a companion appeal, 2014-CA-0478. An opinion in the appeal of the companion case is handed down contemporaneously with the opinion in this case. Sullivan v. Malta Park, 14-0478 (La.App. 4 Cir. 12/10/14), 156 So.3d 751, 2014 WL 6982458.

. The jurisprudence has recognized that in defamation cases summary judgment is "particularly useful as a 'procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by un-meritorious actions which threaten the free exercise of rights of speech.’ ” Mitchell v. Villien, 08-1470, p. 7 (La.App. 4 Cir. 8/26/09), 19 So.3d 557, 563 (quoting Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 25 (La.7/10/06), 935 So.2d 669, 686). This case, however, involves a private citizen suing a private citizen on a matter of private concern; "[hjere, the constitution arguably may not impose any restrictions.” Frank L. Maraist and Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 19.02[8] (2004 ed.).

. Mr. Bandaries contends that there are disputed issues of fact as to the reason for Mr. Schmidt’s statements and the damages the statements allegedly caused. He points out that no discovery has been done on these issues and that Mr. Schmidt has not yet been deposed.

. We likewise find Mr. Schmidt's reliance on Preis v. Durio, 94-468 (La.App. 3 Cir. 11/2/94), 649 So.2d 600, misplaced. In the Preis case, the court held that "[a]n attorney representing a party in a marital dispute where there are children does not owe a legal duty to the adversarial spouse-joint custodian of the children to avoid discussing the case with the children against the will of the adversarial spouse, when the defendant-attorney has the consent of the client spouse who is the other joint custodian of the children.” Preis, 94-468 at p. 6, 649 So.2d at 603. In so holding, the court cited "[t]he [well established] rule that an attorney does not owe a legal duty to his client's adversary when acting on his client’s behalf.” Id. (citing Penalber v. Blount, 550 So.2d 577, 581 (La.1989)). Unlike in the Preis case and as noted elsewhere in this opinion, the underlying suit in this case was not a marital dispute between two contentious spouses in which the attorneys were maligning each other.

. In McFarland, the court collected the cases from other jurisdictions supporting the proposition that an accusation of adultery is defam *1213 atory per se. McFarland, 684 F.Supp.2d at 1086-87 (citing Green v. Rogers, 234 Ill.2d 478, 334 Ill.Dec. 624, 917 N.E.2d 450, 459 (2009) (noting that "words that impute a person has engaged in adultery or fornication” are considered defamatory per se under Illinois law); Parrish v. Allison, 376 S.C. 308, 656 S.E.2d 382, 389 (S.C.Ct.App.2007) (holding that under South Carolina law “slander is actionable per se” where plaintiff is alleged to have committed adultery); Gordon v. Boyles, 99 P.3d 75, 79 (Colo.Ct.App.2004) (holding that a statement that plaintiff had engaged in an extramarital affair was defamatory per se under Colorado law); City of Fairbanks v. Rice, 20 P.3d 1097, 1107 (Alaska 2000) (holding that statements that plaintiff had had an extramarital affair were defamatory per se); Baskin v. Rogers, 229 Ga.App. 250, 493 S.E.2d 728, 730 (1997) (statements that plaintiff had "affairs” constituted slander per se); Nazeri v. Missouri Valley College, 860 S.W.2d 303, 312 (Mo.1993) (holding that statements that insinuated that plaintiff was an adulteress were actionable as slander per se under Missouri law); Gorman v. Swaggart, 524 So.2d 915, 921 (La.App. 4th Cir.1988) (holding that statements imputing adultery are defamatory under Louisiana law); Devlin v. Greiner, 147 N.J.Super. 446, 371 A.2d 380 (N.J.Super.Ct.1977) (holding that private detective’s report "imputing to plaintiffs an adulterous relationship, constitutes libel as a matter of law.”); Baird v. Dun and Bradstreet, 446 Pa. 266, 285 A.2d 166, 171 (1971) (report stating that plaintiff had been indicted for adultery was libelous per se); see also Donati v. Queens Ledger Newspaper Group, 240 A.D.2d 696, 659 N.Y.S.2d 306 (1997) (reversing dismissal of defamation claim where plaintiff alleged that item in newspaper was capable of defamatory connotation that plaintiff had been engaged in a longstanding extramarital affair). But see Marleau v. Truck Ins. Exchange, 333 Or. 82, 37 P.3d 148, 156 (2001) (holding that statement made to plaintiff’s neighbors that plaintiff committed adultery was not slander per se because adultery is no longer a crime under Oregon law)).