674 So.2d 272 (1996)
Cynthia Ledet RATCLIFF, et al.
v.
Earl M.J. BOYDELL, Jr., and Deonne Du Barry, et al.
Nos. 93-CA-0362, 92-CA-0630.
Court of Appeal of Louisiana, Fourth Circuit.
April 3, 1996.
Order on Rehearing May 31, 1996.
*274 Cleveland, Barrios, Kingsdorf & Casteix, Dawn M. Barrios, Bruce S. Kingsdorf, New Orleans, for Plaintiff-Appellee Cynthia Ledet Ratcliff and Dawn M. Barrios, Defendant-Appellee.
Stephen B. Murray, Patricia R. Murray, Jeanmarie Lococo Nicholson, Murray Law Firm, New Orleans, for Defendant-Appellant Earl M.J. Boydell, Jr.
Roy Clifton Cheatwood, Paul L. Peyronnin, Phelps, Dunbar, L.L.P., New Orleans, for Defendant-Appellant Deonne Du Barry.
*275 Before SCHOTT, C.J., and LOBRANO and JONES, JJ.
SCHOTT, Chief Judge.
This case involves a dispute between plaintiff and her attorneys, Earl Boydell, Jr. and Deonne Du Barry, over the amount of the fee plaintiff owed them after plaintiff settled a tort suit. The dispute was over the amount due defendants under a contingent fee contract for a "structured settlement" plaintiff made with the tort-feasor. Defendants failed to return the disputed amount of $25,214.00 to plaintiff and hotly contested her claim. This appeal followed as a result of a judgment in her favor against defendants not only for a full refund of the fee but also for $131,000.00 for damages for abuse of process, unethical practices, fraud and conversion, attorney's fees, and sanctions. The issues are primarily factual along with legal issues as to the attorney's fees and sanctions.
Plaintiff's husband was killed in an accident. After being contacted by Barbara Arnold, an associate attorney employed by defendants, plaintiff employed defendants to handle her wrongful death action against AMC Jeep, the manufacturer of the vehicle her husband was driving when he had a roll-over accident. On September 28, 1994, she signed a contingent fee contract on a form provided by defendants. In pertinent part, the contract provided that she was employing and retaining "the services of Deonne Du Barry and Earl M.J. Boydell, Jr. d/b/a/ Du Barry and Boydell and all associates "to handle her case." The fee arrangement was an assignment by plaintiff to defendants of one third "of [her] claim of which amount is received in settlement of the matter" or forty percent of her "claim" if suit was filed. Defendants filed plaintiff's tort suit on October 4, 1984. When the trial of the case commenced on October 10, 1985, and jury selection was in progress, the parties reached an agreement to settle the case on the basis of a lump sum of $225,000.00 and a "structured settlement" of the balance.
While the foregoing facts are uncontradicted, those summarized hereafter were disputed primarily by the testimony of defendant, Boydell. The conflict between his testimony and that of plaintiff along with her witnesses was resolved in her favor on the basis of credibility. The trial judge gave extensive reasons for judgment including factual findings and conclusions which are supported by plaintiff's evidence. From our review of the voluminous record we find no manifest error in the judge's factual findings and conclusions. Consequently, we find the pertinent facts to be as follows:
In settling her case, plaintiff was acting for herself and for her minor son. It was in his best interest for the settlement to be structured for payments to be made in the future. At the conference the parties first agreed on an initial settlement of the lump sum of $225,000.00 and an annuity of $724,000.00 to be paid in a lump sum in twenty-five years. However, plaintiff had misgivings about this arrangement, preferring a structure which would provide for periodic payments over the years. AMC Jeep, the tort-feasor, had no problem with the mechanics of the structure as long as the cost to them was the same. Plaintiff was authorized by AMC and by Barbara Arnold, defendants' associate, to meet with AMC's structured settlement broker to select a satisfactory plan. She selected an annuity calling for monthly payments of $1,000 for the life of her son starting on January 1, 2002, and lump sum payments of $25,000.00 on January 1, 2006; $40,000.00 in 2011; $60,000.00 in 2016; $90,000.00 in 2021; $130,000 in 2026; $200,000.00 in 2031; and $300,000.00 in 2036.
The settlement documents were delivered to Boydell, and plaintiff went to his office to conclude the matter on November 5. Boydell deducted from the $225,000.00 his forty percent or $90,000.00 and costs of $17,217.50. He also withheld $45,000.00 which was forty percent of $112,000.00 which Boydell considered to be the present value of the annuity. Plaintiff questioned the amount of the fee on the annuity and Boydell accused her of not trusting him. She became emotional and left with the check for $72,782.50 which she cashed.
Plaintiff had grave misgivings that the fee was excessive. This led her to consult with an attorney, Dawn Barrios, and to write this letter to Boydell on November 21:
*276
Mr. Earl Boydell
4515 Canal Street
New Orleans, Louisiana
Dear Earl:
I hope that you can appreciate my concern that John, Jr. and I receive all that is due to us for the pain we have suffered, but more importantly for our financial security. It is because of this concern for our future that I make these inquiries into the fee assessment on John, Jr.'s annuity and the various costs associated with the settlement with AMC.
As in our discussion on November 5, 1985, I am still unclear on your fee assessment for my son's annuity. You determined the present Value of John, Jr.'s settlement to be $112,500 and based on this value took $45,000 as your fee. I have determined the present value of this portion of the settlement to be between $45,000 and $70,000 depending on the interest rate applied. Because these figures differ greatly, I am afraid that this value may have been miscalculated.
I know that you would like to see that John, Jr. and I get the financial support that we deserve, afterall, this is the reasons that I agreed to proceed with the litigation. Therefore, you can understand why I am requesting a written explanation of the calculations that you used to determine this value or the name of the financial expert who provided you with this value.
In addition, I am requesting that you send me copies of the receipts and/or invoices for the expert, deposition and other costs totaling approximately $15,000 plus. I would appreciate your prompt response on this matter.
Thanking you in advance for your cooperation.
Boydell responded as follows:
Ms. Cindy Ratcliff
307 Good News
Belle Chasse, Louisiana 70037
Re: Ratcliff v. A.M.C.
Dear Cindy:
I was very disappointed to receive your letter of November 21, 1985. Barbara and our Law Firm have all worked extremely long and hard on your case. In court, I wrote out the exact attorneys' fees and approximate expert fees and outstanding costs. Based on your approval, the Judge's consent, opposing counsel, and your attorneys all agreed to the settlement.
Our estimate of present day value was based on information from both attorneys and accountants, all of whom were quite familiar with structured settlements. If through your own "post settlement" negotiations with the insurance company, either you yourself reduced the present day value, or received bad information; we are not responsible for those actions. Our estimation was as accurate as one can get, and you willingly accepted it. We would never do anything to hurt either John, Jr. or yourself.
* * * * * *
We have worked for you faithfully and honestly for over a year giving you the best service possible. We all hope that this relationship will continue.
On January 29, 1986, Barrios wrote to Boydell demanding a refund for the plaintiff. Barrios referred to and attached a copy of a report from economist, Melville Wolfson, in which he estimated that the cost of plaintiff's annuity was $44,900.00 and stated that the fee of forty percent should have been calculated on this figure. This would have amounted to $17,960.00 instead of $46,400.00 Boydell withheld.
Faced with this demand for a refund of $28,440.00, Boydell responded by writing to plaintiff and enclosing a bill for $14,244.00 for legal services such as handling the tutorship for her son, the succession of her husband, and some real estate work. In his letter Boydell told plaintiff he was sending this bill because she had "decided to look `a gift-horse' in the mouth" by consulting with another attorney to take action against him. He threatened "to return in kind" a suit against her if she proceeded against him.
On June 23, 1986, plaintiff filed the suit commencing these proceedings. After filing numerous exceptions, motions, and other *277 pleadings, none of which had merit, defendants filed their answer in August 1989 and the case came to trial in April 1992. On June 5, 1992, the trial court rendered judgment against the defendants for $98,214.00 consisting of the following: $25,214.00 for a refund of attorney's fees wrongfully calculated; $43,000.00 for abuse of process; $12,000.00 for unethical practices, fraud and conversion; and $18,000.00 for intentional infliction of emotional distress. The trial judge gave thirty-four pages of reasons for judgment which are available to the parties and will be available to a reviewing court. We will not attempt to summarize these reasons except to the extent necessary for our purposes in reviewing the judgment. The trial court granted plaintiff's motion for a new trial on the issue of attorney's fees and on October 2, 1992, awarded plaintiff $28,000.00 attorney's fees based upon LSA-C.C. art. 1958 and $30,000.00 attorney's fees based upon LSA-C.C.P. art. 863. From these judgments comes the present appeal.
Each defendant, Boydell and Du Barry, filed briefs in this court assigning numerous errors. We begin with Boydell whose brief is voluminous and includes a multitude of factual and legal arguments.
In order to address Boydell's arguments we must first recognize that many of them are based upon his version of the facts which, as reflected above, was rejected by the trial court. Similarly, many of his legal arguments have no merit because they rest upon his rejected factual assumptions. Therefore, it is appropriate to begin by summarizing the operative facts and the consequences which flow from those facts as a matter of law.
When plaintiff and defendants entered into the contingent fee contract, defendants assumed responsibilities or duties which would bind them throughout the handling of this case. One of those duties was to provide competent representation for their client. EC 6-4. (The citations to Ethical considerations and Disciplinary Rules are contained in the former code of Professional Responsibility in effect until January 1, 1987.) Another is the duty of loyalty to the client which prohibits representation when it is limited by the lawyer's own self interests. DR 5-101. Still another requires a lawyer holding property in which both he and another claim interests, to separate and keep separate such property until the dispute is resolved. DR 9-102. Also, a lawyer is bound to conduct himself so as to reflect credit on the profession and to inspire the confidence, respect, and trust of his clients and to strive to avoid not only professional impropriety but even the appearance thereof. EC9-6.
When the settlement conference took place in court there was no problem with the fact that defendants would recover forty percent of plaintiff's recovery; the problem lay in evaluating that recovery. As far as AMC Jeep was concerned, it was willing to pay in settlement the $225,000.00 plus its cost of the annuity; otherwise it would go to trial. This cost was eventually shown to be $49,465.00. Unfortunately, AMC Jeep's attorneys would not disclose the cost of the annuity because of their belief that this would somehow violate the rules of the Internal Revenue Service. However, everyone at this conference knew, including Boydell, that the basis for his forty percent had to be either the cost or the present value of the annuity. Boydell also knew that plaintiff would not accept the annuity providing for the $724,000.00 lump sum payout in twenty-five years but would be free to select another plan as long as the cost was the same.
When Boydell left that conference, he knew he was under an obligation to determine the cost or value of that settlement in order to compute the correct fee due him under his contract with plaintiff. This information was readily available, but only from an actuary, an economist, or perhaps a broker who sells structured settlements. A certified public accountant without these additional specialties would not be able to provide this information. Boydell knew this, but instead of contacting someone who could provide him with the value he called his own CPA and compounded his dereliction by posing a loaded question to him. Boydell had concluded in his mind that the value of the $724,000.00 annuity was $112,000.00. He asked the CPA to determine an interest rate which could somehow justify this figure. Of course, an interest rate can be selected to *278 justify any value chosen but this is irrelevant in that the cost or value of an annuity depends upon a realistic projection of interest rates and the economic considerations of the company selling the annuity. Even Boydell's CPA testified that he told Boydell at some point that Boydell needed to consult an economist or an actuary in order to get this information. The trial court ultimately chose to use the cost of the annuity to determine the forty percent attorney's fee.
Boydell complains at great length about the trial court's decision to base the fee on the cost of the annuity. He insists that present value, not cost, was the proper amount and he argues that present value can be much more than the cost and that value, unlike cost, can fall within a wide range. His problem is that he never produced one shred of evidence to support this theory. He complains because the court would not allow him to call as expert witnesses two attorneys, but he never offered an economist or actuary to support his theory even though he had seven years to find one. He finds himself in much the same position as the attorney in Reed v. Verwoerdt, 490 So.2d 421, 426 (La.App. 5 Cir.1986). There is no credible evidence that Boydell wanted to be paid from future payments and no evidence of the present value of the annuity or that present value would be significantly different than cost. Consequently, cost was the only practical basis the trial court could use.
The trial court concluded that only three methods of computing the fee on the annuity were available, using as a basis the annuity's present value, its cost, or the actual amount paid with the understanding that the fee would be taken out from the future payments. Boydell argues that there was no statutory or jurisprudential authority for this conclusion and faults the trial judge for referring to post 1985 articles and comments as authority. The problem is Boydell has never suggested any other approach and we are not aware of any. Common sense seems to dictate that these are the only approaches.
When the time came for Boydell to meet with his client and divide the recovery as agreed to in the contingent fee contract, he had no sound basis for believing the value of the annuity was $112,000.00 but he would use that figure regardless. At trial he apparently realized that this position was untenable so he testified that he and plaintiff entered into a new contract at the meeting. Now Boydell's story is that he wanted to take his forty percent over the years (twenty-five or maybe until the year 2036) but plaintiff wanted to pay him off and be done with him. So they negotiated the fee of $45,000.00. Not so says plaintiff and not so says the trial judge. No such thing happened. Instead, when Boydell showed plaintiff the figures she immediately let him know that she thought something was wrong. This is what triggered Boydell's duty to his client. He was on notice that his ability to be fair with his client in deducting his fee was limited by his own self interest. DR 5-101. He was under a duty to separate the disputed funds from his own and to keep them separate. DR 9-102.
Instead, he pressured and intimidated the client into taking a check for $72,782.50 which she believed was insufficient and he disbursed the balance $68,283.00 to his associate, Arnold, and the balance, some $84,434.00, to himself and Du Barry. Interestingly, Boydell says repeatedly that he first became aware of plaintiff's dissatisfaction with these disbursements when he received her letter two weeks later. Consequently, he argues that he was under no obligation to escrow the disputed funds because they were already disbursed. Unfortunately for Boydell, this argument depended upon the trial judge believing his version of what happened at the meeting. Because the judge did not believe him, Boydell is stuck with the fact that his disbursement of the funds took place after he was on notice of the dispute and the conflict with his client.
Boydell's conduct after the disbursement of the funds began with his reply to his client's letter which are quoted above. Suffice it to say that plaintiff's letter was a perfectly legitimate and reasonable inquiry as to how Boydell arrived at his fee. His reply was not merely curt, self righteous and intimidating, but untrue. His statement that his estimate of present value was based on information from attorneys and accountants *279 familiar with structured settlements was never shown to be true for the next seven years. Furthermore, the statement misrepresents the fact that accountants and lawyers are somehow qualified to give this information. Boydell knew otherwise. Next came a perfectly legitimate and reasonable demand from Barrios containing the very expert information Boydell never bothered to get. His reaction was to ignore the substance of the letter and to respond by sending a letter to his former client, now Barrios's, threatening to sue her, if she sued him, for services which were incidental to his representation of her in the tort suit and which he never intended to bill her for when they were performed.
Boydell's conduct in this litigation has been quite remarkable. In her original petition, plaintiff prayed for the fee refund, mental anguish, and attorney's fees. Among her allegations was the following:
Defendants have breached the Canons of Ethics in soliciting a client and withholding funds owed to plaintiffs, have breached the fee agreement between the parties, and have dealt with plaintiffs in an unfair, fraudulent, illegal, unethical and immoral manner.
Boydell and Du Barry answered the petition three and one-half years later. In the meantime, they filed sixty motions and exceptions and took six devolutive appeals. Virtually none of these maneuvers was meritorious. They filed a suit against plaintiff for those incidental services which Boydell admitted should not have been filed. They filed a suit against plaintiff for $7,024,244.00 for defamation and malicious prosecution. They also filed a defamation and malicious prosecution suit for $10,000,000.00 against plaintiff's attorney Barrios and her husband, a physician. They sued the structured settlement broker who sold the annuity plaintiff selected on the ground that the broker induced her to change annuity plans without their advice. And they filed still another defamation suit against Barrios for alleged comments she made about them to a former client of theirs. (This suit is pending under docket No. 92-CA-0630 in which a separate opinion is rendered on this date.) When serving suits and papers on plaintiff, they wrongfully used a special process server to serve her in person at home and at work instead of serving her through her counsel of record.
Boydell offered excuses, explanations, and rationalizations for this conduct. He characterized it as aggressive but legitimate defense tactics against a groundless suit, an understandable and righteous response to the scurrilous accusations made against him especially in the paragraph of the petition quoted above; and, with respect to the personal service of pleadings on plaintiff, a necessary tactic to insure that she had knowledge of what her attorney, Barrios, was saying about and doing to him.
Most of the numerous arguments and assignments of error in Boydell's voluminous brief have been disposed of in the foregoing discussion. We now turn to the others. First, Boydell argues that claims of damage from fraud, unethical practice, conversion, abuse of process and intentional infliction of emotional distress were not cognizable because they involve the behavior of a lawyer. He contends that Art. V § (5)(B) of the Constitution confers jurisdiction over such behavior in the Supreme Court. This argument is specious. The Supreme Court has jurisdiction over disciplinary proceedings against a lawyer but a litigant who suffers damages as a result of a lawyer's misconduct has a perfect right to seek redress in court.
Next, Boydell complains that the court allowed plaintiff's expert witness, a lawyer, to testify but would not allow his expert witnesses, two lawyers, to testify. The record shows that defendants unlike plaintiff failed to give proper and timely notice of their intention to use these lawyers as expert witnesses. Boydell fails to show any abuse of discretion on the part of the trial court.
In any event, we must point out that Boydell's lengthy brief contains a complete summary of the testimony of these two attorneys, and most of their testimony was based upon Boydell's version of the facts which was incorrect and slanted in his favor.
Third, Boydell says there is no legal authority for a court to award tort damages to *280 a former client for ethical violations. This overlooks the very basis for tort liability which is the duty-risk concept. When a lawyer commits a breach of duty imposed by the ethical rules and that breach is a cause in fact of his client's damage, she has a right to recover in tort. The fact that the Supreme Court might also take disciplinary action against him hardly deprives her of her tort remedy.
Boydell also asserts that there was no proof of fraud. LSA-C.C. Art. 1953 defines fraud as follows:
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
Knowing full well that he had to see an economist or an actuary to learn the value of plaintiff's annuity and having no idea of its true value, Boydell misrepresented the value to be $112,000.00 and suppressed the truth by intimidating plaintiff all for the purpose of obtaining an unjust advantage in the form of an excessive fee. Knowing full well that plaintiff questioned the fee, he immediately disbursed the funds to Arnold and to himself.
Next, Boydell assigns errors in the trial court's awards for intentional infliction of emotional distress and abuse of process.
To prove intentional infliction of emotional distress plaintiff must show: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result in this conduct. White v. Monsanto Company, 585 So.2d 1205, 1209 (La.1991). Other factors to consider are whether a pattern of deliberate and repeated harassment existed, whether defendants knew that plaintiff was susceptible to emotional distress, and whether defendants' conduct was calculated to cause severe emotional distress and not just a lesser degree of fright, humiliation, embarrassment, and worry.
Given these criteria, the trial court concluded that defendants' behavior constituted intentional infliction of emotional distress. The court relied upon defendants' vindictive, dilatory, and obstreperous behavior over the previous six years; baseless and frivolous counterattacks in pleadings and motions including a seven million dollar defamation suit against plaintiff; use of a private process server upon plaintiff at home and at work; the refusal to answer plaintiff's original petition for over three and one-half years and a devolutive appeal of the order to answer; defendants' knowledge that plaintiff had more than an ordinary dislike for trial having themselves sent her to two psychiatrists during the wrongful death proceedings; and Boydell's own admission that he intended his conduct to cause plaintiff distress because he was angry about the allegations of fraud made against him and to induce her to drop the suit.
The cumulative effect of defendants' consistently obstreperous behavior over such a protracted period of time makes it extreme and outrageous. The trial court's simple rendition of the facts supporting this award is not adequate to describe defendants' outrageous conduct, its intended effect, and its actual result. Defendants' argument that a plaintiff must suffer a mental breakdown or seek professional help in order to prove her severe distress is unwarranted and unsupported. The record shows that plaintiff remained in a constant state of great emotional upheaval during the pendency of this litigation just as defendants' intended.
To prove abuse of process, the parties agree that plaintiff must prove (1) an ulterior motive and (2) willful acts in the use of the process not proper in the regular conduct of litigation. Umerska v. Katz, 477 So.2d 1252, 1255 (La.App. 4th Cir.1985). Defendants claim that their aggressive defense against plaintiff's suit and their aggressive offense in filing other suits do not constitute abuse of process; that they were only defending themselves and redressing the wrongful assertion of untrue accusations against them.
The trial judge gave extensive reasons which support the judgment for damages *281 for abuse of process. Defendants filed suit on open account against plaintiff for work incidental to the wrongful death action. Boydell admitted that the suit on open account should not have been filed against plaintiff. They filed a baseless seven million dollar defamation suit against plaintiff because they were angry about allegations of fraud made against them and thought such a suit might induce plaintiff to drop her suit. They used a private process server to serve plaintiff at home and at work even though plaintiff's attorney had never avoided service and without due diligence of using the sheriff's office first. They filed a defamation suit for millions of dollars against Barrios and her husband to pressure plaintiff to drop the suit without any inquiry into the existence of a community property regime between Barrios and her husband. After suit was dismissed against Barrios, defendants filed the same defamation claim via reconventional demand. They filed suit without any investigation against AMC and Galaher Settlements and its employee Gaines. Defendants took over three and one half years to answer plaintiff's original demand and then devolutively appealed the order to answer. They filed in excess of 60 exceptions and motions, and six devolutive appeals. The record supports the finding that defendants' conduct constituted abuse of process.
Boydell's next assignment for error as to the original judgment for damages is that they are punitive, duplicative, and excessive. The trial court specifically awarded $43,000.00 for abuse of process, $12,000.00 for unethical practices, and $18,000.00 for intentional infliction of mental and emotional distress. Boydell argues that whatever plaintiff may be entitled to for mental anguish, pain, and suffering had to be fully contained in the $18,000.00 award for mental and emotional distress. Consequently, he says, the remaining $55,000.00 was punitive and duplicative.
While this argument may be supported by a literal interpretation of the judgment, we interpret the judgment to mean that the monetary amounts were for damages caused by each tort. Furthermore, while the trial court divided the damages, perhaps inappropriately, we interpret the judgment to be one for $73,000.00 in addition to the $25,214.00 for the refund of the wrongfully retained fee. Considering the record as a whole we are not persuaded that this award for general damages was abusive of the trial court's vast discretion.
Boydell also complains about the absence of some of the causes of action from the pleadings but we are satisfied that all causes of action were properly before the court pursuant to C.C.P. arts. 862 and 1154. They were either implied from the allegations of the petition as amended or tried by implied consent of the parties. Interest properly runs on the $73,000.00 from date of judicial demand under C.C.P. art. 1921 and R.S. 13:4203 since the amendments adding all causes of action not originally pled relate back to the original petition. C.C.P. art. 1153. The trial court properly awarded interest on the $25,214.00 from November 5, 1985, since that is the date when it was due under the contract.
Turning to Du Barry's brief, much of it is repetitious of Boydell's and will not be discussed again. One of her principal arguments is that she was not directly involved in this case but that Boydell alone handled everything that eventually brought them to this point. This is not accurate. First and foremost, the contingent fee contract whose breach is the basis of this suit was with her and Boydell. She was an obligor under that contract. If she delegated her duties to Boydell this did not relieve her of her obligation to plaintiff. Second, while Boydell was the principal actor in the mishandling of the fee, she knew that a dispute existed and did nothing to resolve it. She was present at the November 5 meeting, she participated in some of the court hearings and depositions, and she allowed Boydell to sign her name to pleadings. Finally, this court's opinion in Ratcliff v. Boydell, 540 So.2d 537 (La.App. 4th Cir.1989), writ denied, 546 So.2d 175 (La.1989) demonstrates greater participation by Du Barry than she claims.
Du Barry contends that the trial court erred in finding her to be solidarily liable for plaintiff's damages. When different *282 obligors owe together just one performance to one obligee, but neither is bound for the whole, the obligation is joint for the obligors. C.C. art. 1788. However, when each obligor is liable for the whole performance, the obligation is solidary. Art. 1794. Whether an obligation is several or joint depends upon the parties' intention or understanding. Revision Comment (d) to Art. 1788. Plaintiff employed both defendants to handle her case. There is no evidence that she expected Boydell to handle her case. Surely, had Boydell been unwilling or unable to handle the case Du Barry would have done so. It was their intention that each would be liable for the whole performance. Furthermore, one who conspires with another to commit an intentional or willful act is liable in solido with the principal actor. C.C. art. 2324. The fact that Du Barry was well aware of this dispute and participated in Boydell's handling of this matter makes her liable under this article as well.
Du Barry contends that she is not personally liable to plaintiff because she and Boydell were practicing law as a corporation. If they were, it matters not because plaintiff's contract was with them as individuals operating under a trade name. Having concluded that the trial court correctly found Du Barry solidarily liable with Boydell to plaintiff in the original judgment we turn to the second judgment following plaintiff's motion for a new trial.
Both defendants assign error in the trial court's award of attorney's fees, $28,000.00 pursuant to C.C. art. 1958, and $30,000.00 pursuant to C.C.P. art. 863. These assignment have merit. C.C. art. 1958 provides for attorney fees where a contract is rescinded because of fraud. The Revision Comments indicate that this article is referring to fraud in the confection of the contract, not in the performance. In this case there was no fraud in the confection of the contingent fee contract. The fraud was committed in the performance, i.e., which was supposed to involve defendants' taking the correct fee and disbursing to plaintiff the amount due her. Fraud in the performance of the contract makes the obligor liable for compensatory damages under C.C. art. 1997, but this article is silent with respect to attorneys' fees. In Louisiana, attorneys' fees have never been considered to be compensatory damages. The general rule has always prevailed that the right to recover attorney fees must be expressed by a statute or a contract. In the present case, there is neither and this award of attorney fees was erroneous.
The final issue is the award of attorneys' fees under C.C.P. art. 863. In pertinent part this provides as follows:
Pleadings need not be verified or accompanied by affidavit or certificate, except as otherwise provided by law, but the signature of an attorney or party shall constitute a certification by him that he has read the pleading; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact; that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to reversal of existing law; and that it is not interposed of any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
When the hearing on the sanctions was conducted in connection with the motion for new trial, the trial judge stated that he was imposing the art. 863 sanctions based upon the totality of the record.
Defendants correctly point out that Art. 863 became effective on January 1, 1989, and applies only to pleadings filed after that date. Consequently, to the extent that the sanctions were imposed for those pleadings comprising that part of the record generated prior to 1989 the judgment is erroneous. However, from our inspection of those pleadings contained in the appellate record it appears that a substantial majority of them were filed after 1989. In any event, some adjustment in the award is in order. Likewise, it appears that on a number of occasions while the pre-trial activity was in progress, plaintiff specifically asked for art. 863 sanctions as to certain pleadings and these requests were denied. Defendants are entitled to a further adjustment for that part of *283 the sanctions which were based on these pleadings as to which the court already denied them.
As to the appropriateness of sanctions, what the trial judge had to say in his original judgment and what we have said in this opinion as to the issues of intentional infliction of emotional distress and abuse of process clearly demonstrate that Boydell and Du Barry violated art. 863, especially in that the vast majority of their pleadings were filed to harass the plaintiff and to cause unnecessary delay and expense of the litigation. Flagrant examples are the claims for the incidental services and the defamation and malicious prosecution claims. These were originally filed in 1986, but the defendants discontinued these original suits and renewed them as incidental demands in 1989.
Perhaps the worst example of a sanctionable pleading was the affidavit of contested material facts signed and filed by Boydell and Du Barry shortly before the trial of the case. In it they swore they would produce experts at the trial to show that the cost of the annuity plaintiff received was not its proper value and was not even relevant. They suggested that AMC got this annuity at a special discount. As stated above, they put on no such evidence so that their affidavit was clearly false on a critical aspect of the case and served to thwart plaintiff's motion for summary judgment for the refund portion of her claim.
In order to avoid repetition, we refer back to our discussion of the abuse of process issue. There is no way to rationalize defendants' conduct in this case as simply an aggressive but legitimate defense to a claim. They turned this simple claim for a $25,000.00 refund into a procedural morass and marathon for the purpose of intimidating and punishing plaintiff for daring to sue them. The pleadings they signed were designed to accomplish this purpose. Considering that some adjustment is in order as aforesaid but also considering the great discretion of the trial judge in such matters we affirm the imposition of the sanctions but reduce the award to $20,000.00.
Accordingly, the judgment of June 5, 1992, awarding plaintiff $98,214.00 plus interest is affirmed. As to the judgment of October 2, 1992, that part awarding plaintiff $28,000.00 for attorney fees under Civil Code Article 1958 is reversed and set aside, and that part awarding plaintiff attorneys' fees under Code of Civil Procedure Article 863 is amended to reduce this award to $20,000.00. In all other respects the judgments are affirmed including the assessment of all costs of these proceedings including the cost of this appeal against defendants.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.
PER CURIAM.
On application of defendant-appellant, Deonne Du Barry, we grant a limited rehearing for the sole purpose of amending our original opinion with respect to interest on the amount of the award of $98,214.00 against defendant, Du Barry. Interest on that portion of the award for abuse of process and intentional infliction of emotional distress in the amount of $61,000.00 will run from date of the original judgment of the trial court. Interest on the balance of $37,214.00 will run from date of judicial demand.
In all other respects the application for rehearing is denied.