ROSEMARY LEDET, Judge.
| ,This appeal involves a claim for intentional infliction of emotional distress. (“IIED”) by a non-client, Judith Sullivan, against her adversary’s lead attorney, F Evans Schmidt.[1] From the trial court’s* judgment granting Mr. Schmidt’s peremptory exception of no cause of action, Ms. Sullivan appeals.[2] The narrow issue presented is whether, in the context of a discovery deposition, a defense attorney, posing offensive questions to a seventy-year-old, medically impaired plaintiff who was living in an assisted living facility and alleged to be terminally ill, constitutes outrageous conduct. The gist of the offensive questions is whether the plaintiff knew that her two attorneys — one of whom was her husband-caretaker; the other was her husband’s law partner — were having an affair. The plaintiff alleges that the defense attorney knew that the questions, which were posed as affirmative statements, were false. Based on our review of the petition, we find the questions were not relevant, pertinent, or material to the underlying | j>suit. Given the irrelevant nature of the questions coupled with the plaintiffs vulnerable condition, we find the plaintiff has stated an IIED cause of action. We thus reverse and remand for further proceedings.
FACTUAL AND PROCEDURAL BACKGROUND
From December 2011 until November 2012, the plaintiff, Ms. Sullivan, was a resi *753 dent of Malta Park, a former assisted living facility located in New Orleans, Louisiana. In November 2012, Ms. Sullivan’s husband-caregiver, Madro Bandaries,[3] removed her, for her safety, from Malta Park and placed her at another assisted living facility, St. Francis Villa Assisted Living (“St. Francis”). In February 2013, Ms. Sullivan and another named plaintiff commenced this suit against, among others, Malta Park.[4] In their original petition, the plaintiffs asserted tort and contract claims arising out of the deficient care Malta Park provided to them while they were residents there.[5] Ms. Sullivan also asserted that Malta Park had fraudulently attempted to seek extra funds from her by reassessing her at a |shigher level of care. M. Claire Trimble and Mr. Bandaries, both members of Madro Bandaries PLC, signed the original petition as the plaintiffs’ attorneys.
During the course of discovery in this case, the Malta Park Defendants’ attorneys noticed Ms. Sullivan’s deposition. On October 7, 2013, Mr. Schmidt, the Malta Park Defendants’ lead counsel, took Ms. Sullivan’s deposition at St. Francis. Present at the deposition were the following people: (i) Mr. Schmidt, Malta Park’s lead attorney; (ii) Caitlin Morgenstern, Mr. Schmidt’s associate and another attorney for Malta Park; (iii) Ms. Trimble, Ms. Sullivan’s attorney and Mr. Bandaries’ associate; and (iv) Mr. Bandaries, Ms. Sullivan’s husband-caregiver and also her attorney. Mr. Bandaries was present at the deposition in his capacity as caregiver, not as attorney. At the conclusion of the deposition, the following colloquy occurred between Mr. Schmidt and Ms. Sullivan:
Q. [Mr. Schmidt] Do you know who this lady is next to you?
A. [Ms. Sullivan] Yes
Q. [Mr. Schmidt] Who’s that?
A. [Ms. Sullivan] My husband’s partner.
Q. [Mr. Schmidt] Now, did you talk to her about bringing this lawsuit?
A. [Ms. Sullivan] I don’t remember.
Q. [Mr. Schmidt] Okay. Did she talk to you about the lawsuit?
A. [Ms. Sullivan] I don’t remember.
Q. [Mr. Schmidt] Okay. Has Ms. Trim-ble ever talked to you about her having a sexual relationship with your husband?
A. [Ms. Sullivan] No.
|„MR. BANDARIES:
Hold on. Now, I don’t know where you got that or even-but mark that be *754 cause I’m going to take it before the judge, okay?
MR. SCHMIDT:
That’s fíne.
MR. BANDARIES:
Okay. We’re going to do that. That’s so far off the reservation it’s unbelievable. Okay. Mark it, ma’am, and I want a copy of that deposition.
Q. (BY MR. SCHMIDT) Has your husband ever talked to you about having a sexual relationship with Ms. Trimble?
A. [Ms. Sullivan] No.
Q. [Mr. Schmidt] and you have no knowledge of that.
A. [Ms. Sullivan] No.
Q. [Mr. Schmidt] Okay. I have no other questions.
(Whereupon the deposition was concluded.)
On October 15, 2018, Ms. Sullivan filed a First Supplemental and Amending Petition adding Mr. Schmidt and his alleged insurer, Old Republic Insurance Company (“Old Republic”), as additional defendants.[6] In the First Supplemental and Amending Petition, Ms. Sullivan adopted the allegations of the original petition and added a claim for IIED against the Malta Park Defendants,[7] Mr. I,r,Schmidt, and Old Republic. In the First Supplemental and Amending Petition, Ms. Sullivan made the following averments regarding the IIED claim:
The Incident
VI.
Sullivan, age 70, suffers from a rare condition referred to as Cerebellar Ataxia which requires assistance in regards to her activities of daily living and confinement in an assisted living facility with around the clock assistance with no known cure. Sullivan has been .confined to a wheelchair for more than 12 years, is legally blind and cannot write or feed herself correctly due to her hands being atrophied by the Ataxia.
VII.
Sullivan’s condition results from a dysfunction of the cerebellum which has resulted in the inability to coordinate ongoing movements causing Sullivan to have trouble regulating the force, range or direction of her muscle contractions ....
Regardless, Sullivan hears, understands and is able to make her feelings known if one carefully listens to her slurred speech. Further Sullivan has feelings and is able to comprehend.
VIII.
Sullivan is subject to anxiety and other emotions. In particular after the events of October 7, 2013 Sullivan has *755 suffered an unpleasant state of inner turmoil, exhibited nervous behavior, and complained of unpleasant feelings of dread as to her future. Sullivan’s feelings of fear, worry and uneasiness are accompanied by restlessness, fatigue, and additional problems in concentration which will require additional medical evaluation and a higher level of treatment with all such complaints arising after the incident of October 7, 2013 whereas defendant Schmidt in an untruthful statement, beyond all possible bounds of decency and utterly intolerable in a civilized community told Sullivan that her attorneys, one of whom was her husband, were engaged in a “sexual relationship.” Further Schmidt knew this to be untrue.
IX.
At all times in this litigation and particularly on October 7, 2013, defendant Schmidt knew of the medical condition of Sullivan |fithus leading to the conclusion that his untrue statements in a deposition, blurted out as the last two statements were in spite, intentional and designed to injur[e] Sullivan.
Intentional Infliction of Emotional Distress
X.
On October 7, 2013 counsel for Sullivan arranged for Sullivan to give a deposition in this litigation at the facility where Sullivan lives and receives 24 hour care. The deposition was attended by Sullivan represented by her counsel, M. Claire Trimble, and F. Evans Schmidt and Caitlin Morgenstern representing the defendants. The deposition record notes that Madro Bandaries was “Also Present”. Bandaries is the husband of Judith Sullivan....
XI.
Schmidt’s conduct towards Sullivan was extreme and outrageous, intentional and meant to harm Sullivan as well as confound her relationship with her counsel and husband. Further Schmidt knew that the allegations were untrue. Schmidt’s conduct caused Sullivan to suffer severe emotional distress and' that Schmidt desired to inflict the emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.
XII.
Schmidt’s conduct unto Sullivan was so outrageous in character, so extreme in degree that it goes beyond all possible bounds of decency and can only be regarded as atrocious and utterly intolerable in a civilized community.
XIII.
Schmidt’s actions towards Sullivan with Schmidt being fully aware of her severe medical condition, her terminal illness and in the manner and time in which Schmidt presented the false statements to Sullivan cannot be justified in civilized society and suggest that Schmidt’s crass actions were presented in spite, with malice and with the specific intent to cause Sullivan emotional distress and erode her activities of daily living.
XIV.
A review of the deposition demonstrates that Schmidt could only have made the statements to Sullivan with forethought, in an |7intentional fashion and with the specific intention to engage in the tort of Intentional Infliction of Emotion Distress unto Sullivan.
*756 XV.
Schmidt’s actions have caused damage to Sullivan, including inner turmoil, exhibited nervous behavior, unpleasant feelings of dread as to her future, feelings of fear, worry, uneasiness, restlessness, fatigue, and additional problems in concentration which will require additional medical evaluation and a higher level of medical care all of which Sullivan seeks compensation for.
In response to Ms. Sullivan’s assertion of an IIED claim, both Mr. Schmidt and Malta Park filed a peremptory exception of no cause of action.[8] On March 5, 2014, the trial court rendered judgment dismissing Ms. Sullivan’s First Supplemental and Amending Petition.[9] From this ruling, Ms. Sullivan appeals.
STANDARD OF REVIEW
The governing standards of review of a trial court’s ruling on a peremptory exception of no cause of action recently were summarized by the Louisiana Supreme Court in Maw Enterprises, L.L.C. v. City of Marksville, 14-0090, p. 6 (La.9/3/14), 149 So.3d 210, 215, as follows:
• As we have explained, as used in the context of the peremptory exception, a “cause of action” refers to the operative facts which give rise to the plaintiffs right to judicially assert an action against the defendant.
• The purpose of the peremptory exception of no cause of action is to test the legal sufficiency of the plaintiffs petition by determining whether the law affords a remedy on the facts alleged in the petition.
k* The exception is triable on the face of the pleadings and, for purposes of resolving the issues raised by the exception, the court must presume that all well-pleaded facts in the petition are true.
• The burden of demonstrating that a petition fails to state a cause of action is on the mover.
• Because the exception of no cause of action raises a question of law and the lower court’s decision is generally based only on the sufficiency of the petition, review of the lower court’s ruling on an exception of no cause of action is de novo.
• The pertinent inquiry is whether, viewed in the light most favorable to the plaintiff, and with every doubt resolved in the plaintiffs favor, the petition states any valid cause of action for relief.
Maw Enterprises, 14-0090 at p. 6, 149 So.3d at 215 (internal citations omitted).
The Supreme Court has further noted that Louisiana has a fact pleading system; hence, plaintiffs are not required to plead the theory of their case in the petition. State, Div. of Admin., Office of Facility Planning & Control v. Infinity Sur. Agency, L.L.C., 10-2264, p. 9 (La.5/10/11), 63 So.3d 940, 946. “Never *757 theless, the mere conclusions of the plaintiff unsupported by facts do not set forth a cause of action.” Id.
Lastly, the Louisiana Supreme Court and this court have recognized the well-settled principles that a petition should not be dismissed pursuant to an exception of no cause of action unless it is evident that a plaintiff can prove no set of facts in support of any of the alleged claims and that every reasonable interpretation must be applied to a petition in favor of maintaining its sufficiency. Indus. Companies, Inc. v. Durbin, 02-0665, p. 7 (La.1/28/03), 837 So.2d 1207, 1213; Insulation Technologies, Inc. v. Indus. Labor & Equip. Servs., Inc., 13-0194, p. 4 (La.App. 4 Cir. 8/14/13), 122 So.3d 1146, 1150; Board of Sup’rs of Louisiana State Univ. & Agr. & Mech. Coll. v. 2330 Palmyra St., L.L.C., 11-0443, p. 6 (La.App. 4 Cir. 12/27/11), 80 So.3d 1234, 1239; Tuban Petroleum, L.L.C. v. SIARC, Inc., 09-0302, p. 3 (La.App. 4 Cir. 4/15/09), 11 So.3d 519, 522. Explaining these principles, the Supreme Court has noted:
Simply stated, a petition should not be dismissed for failure to state a cause of action unless it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. Fink [v. Bryant ], 2001-0987 at p. 4, [ (La.11/28/01) ], 801 So.2d [346] at 349. Every reasonable interpretation must be accorded the language of the petition in favor of maintaining its sufficiency and affording the plaintiff the opportunity of presenting evidence at trial. Jackson v. State ex rel. Dept. of Corrections, 2000-2882, p. 4 (La.5/15/01), 785 So.2d 803, 806.
Durbin, 02-0665 at p. 7, 837 So.2d at 1213.
DISCUSSION
On appeal, Ms. Sullivan’s sole assignment of error is that the trial court erred in granting the defendants’ exception of no cause of action and dismissing her First Supplemental and Amending Petition asserting an IIED claim. To establish an IIED claim, a plaintiff must prove the following three factors: (i) that the conduct of the defendant was extreme and outrageous, (ii) that the emotional distress suffered by the plaintiff was severe, and (iii) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. White v. Monsanto, 585 So.2d 1205, 1209 (La.1991); see also Zeigler v. Housing Authority of New Orleans, 12-1168, p. 9 (La.App. 4 Cir. 4/24/13), 118 So.3d 442, 450.
“Louisiana courts, like courts in other states, have set a very high threshold on conduct sufficient to sustain an emotional distress claim, and the Louisiana 1 mSupreme Court has noted that ‘courts require truly outrageous conduct before allowing a claim ... even to be presented to a jury.’ ” Morris v. Dillard Dep’t Stores, 277 F.3d 743, 756-57 (5th Cir.2001) (citing Nicholas v. Allstate Ins. Co., 99-2522, p. 10 (La.11/31/00), 765 So.2d 1017, 1024-25). When a non-client sues her adversary’s attorney, as Ms. Sullivan has done in this case, Louisiana courts have “required more definite allegations to satisfy the ‘specific malice’ requirement of Montalvo [v. Sondes, 93-2813 (La.5/23/94),] 637 So.2d 127.” Mahfouz v. Davenport, 14-358, p. 7 (La.App. 3 Cir. 10/1/14), 149 So.3d 845, 852.[10] Moreover, *758 Louisiana court have recognized that “it is harder to recognize an intentional tort in the context of an attorney’s actions on behalf of his or her client.” Id.
At the hearing on the exception, the trial court stated that it believed the conduct at issue — posing two deposition questions— was “below intentional infliction [of emotional distress.]” The trial court also stated that “asking a question that a lawyer deems or thinks is inappropriate or uncaring” does not rise to the |nlevel of “extreme and outrageous” required for an IIED cause of action. Finally, the trial court suggested that by filing the lawsuit, the plaintiff subjected herself to the broad scope of discovery allowed by La. C.C.P. art. 1422.[11] The trial court thus granted the no cause of action exception.
On appeal, Ms. Sullivan contends that her pleadings were sufficient to establish an IIED cause of action. She contends that she was a vulnerable plaintiff; she points out that at the time of the incident she was seventy years old and suffering from a terminal illness. She further contends that Mr. Schmidt was aware of her fragile condition and that he attempted to use it to his advantage by bullying her. She still further contends that Mr. Schmidt’s questions were not relevant and that he knew the allegations contained in his questions were untrue. Given these facts, she contends that Mr. Schmidt either intended to inflict severe emotional distress on her or knew that severe emotional distress would most likely result from his questions.
Defendants counter that posing offensive questions alone is insufficient to state a claim. They contend that the questions were reasonable inquiries within the context of the litigation and in response to Ms. Sullivan’s answers to the prior deposition questions. They further contend that the questions were directed to “the motivation for caretaker/financial manager efforts to reduce the cost of Ms. Sullivan’s care.” They still further contend that the | ^questions were follow-up questions related to Ms. Sullivan’s initial inability to identify Ms. Trimble as her lawyer and to Ms. Sullivan’s reference to Ms. Trimble as her husband’s “partner” — a “term in today’s parlance can mean any number of things.”
Defendants further counter that, as a matter of law, questions as to a litigant’s knowledge of a sexual relationship that could impact the litigation cannot form the basis for an IIED claim. In support, defendants cite the principle that Louisiana law does not recognize a cause of action for IIED based “solely on allegations of an extramarital affair.” Finally, Mr. Schmidt counters that the deposition questions he posed to Ms. Sullivan were protected by a *759 qualified privilege and thus cannot form the basis for an IIED claim.
To provide a framework for addressing the myriad of contentions raised by the parties, we divide our analysis into three parts: the vulnerable victim, the extramarital affair, and the broad scope of discovery.
The vulnerable victim
“[O]utrageous conduct is a nebulous concept, as it does not refer to any specific type of conduct and it may even refer to a pattern of conduct.” Bustamento v. Tucker, 607 So.2d 582, 538, n. 6 (La.1992). Four main categories of conduct have been recognized as supporting a finding of outrageous conduct:
(1) [A]busing a position of power; (2) emotionally harming a plaintiff known to be especially vulnerable; (3) repeating or continuing conduct that may be tolerable when committed once but becomes intolerable when committed numerous times; and (4) committing or threatening violence or serious economic harm to a person or property in which the plaintiff is known to have a special interest.
|,sAlex B. Long, Lawyers Intentionally Inflicting Emotional Distress, 42 Seton Hall L.Rev. 55, 61, n.31 (2012) (quoting John J. Kircher, The Four Faces of Tort Law: Liability for Emotional Harm, 90 Marq. L.Rev. 789, 803 (2007)). The relevant factor in this case is the second one — the vulnerable victim.
Recognizing the vulnerable victim factor, the Louisiana Supreme Court in White, 585 So.2d at 1210, noted:
The defendant’s knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered. But the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough. Restatement, supra, comment f, § 46. It follows that unless the actor has knowledge of the other’s particular susceptibility to emotional distress, the actor’s conduct should be judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities.
The vulnerable victim category is codified in the Restatement (Second) of Torts § 46 cmt. f (1965), which states:
The extreme and outrageous character of the conduct may arise from the actor’s knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.
Explaining the vulnerable victim category, a commentator notes the following:
[A] basis on which extreme outrage can be found is the defendant’s knowledge that the plaintiff is especially sensitive, susceptible and vulnerable to injury through mental distress at the particular conduct. This goes back to [Nickerson v. Hodges, 146 La. 735, 84 So. 37 (1920),][12] a Louisiana case in which the *760 defendants 114buried a “pot of gold” for an eccentric and mentally deficient old maid to find, and when she dug it up escorted her in triumph to the city hall, where she opened the pot under circumstances of public humiliation. In line with this case there are a number of decisions in which sick people, children, and pregnant women have recovered, on the basis of the defendant’s knowledge of their condition, for profanity and abuse, threatening letters, or other conduct which apparently would not otherwise have been sufficient to constitute a tort.
Dan B. Dobbs, Robert E. Keeton, and David G. Owen, PROSSER AND KEE-TON ON THE LAW OF TORTS, § 12 (5th ed. 1984).
As a commentator points out, “[t]he holding in Nickerson indicates that, in Louisiana, recovery will be allowed, if one takes advantage of the known peculiar sensibilities of another.” Frank L. Maraist and Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 2.06[5], n.47 (2004 ed.). The holding in Nickerson also provides direction on the question of whether recovery will be allowed “if the defendant engages in conduct that would not be offensive or insulting to a reasonable person, but is particularly damaging because of the plaintiffs known peculiar sensibilities.” LOUISIANA TORT LAW, supra.
JjjAs noted, Ms. Sullivan contends that she was a vulnerable victim. In support, she cites the Nickerson case. Although she acknowledges that she was not mentally deficient, Ms. Sullivan contends that she was in a fragile condition and that Mr. Schmidt attempted to use her fragile condition to his advantage. Indeed, she averred in her supplemental and amending petition that she “has been confined to a wheelchair for more than 12 years, is legally blind and cannot write or feed herself correctly due to her hands being atrophied by the Ataxia.” She further averred that Mr. Schmidt was “fully aware of her severe medical condition” and “her terminal illness.” These allegations must be accepted as true given the procedural posture of this case.
In response, Mr. Schmidt points out that the description in the original and supplemental and amended petitions of Ms. Sullivan’s rare medical condition — Cerebellar Ataxia — focuses on the physical effects of the disease. He contends that Ms. Sullivan has not linked the anxiety that she suffered to her rare medical condition. He thus contends that Ms. Sullivan should be viewed as an ordinary person and that his conduct should be “judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities.” White, supra. He emphasizes that if Ms. Sullivan was in need of special provisions during her deposition, her attorney should *761 have obtained a protective order. Accordingly, in determining if she has a cause of action for IIED, he contends that we must determine whether the distress was such that no reasonable person could endure it.
Contrary to Mr. Schmidt’s contention, we find the vulnerable victim factor applies to Ms. Sullivan. It is reasonable to infer, as Ms. Sullivan suggests, that a seventy-year-old, terminally ill woman in an assisted living facility would be especially vulnerable to emotional distress. See Boyle v. Wenk, 378 Mass. 592, 596, 392 N.E.2d 1053, 1056 (1979) (noting that “[t]hough there is no evidence that Wenk knew the precise nature of Mrs. Boyle’s physical susceptibility, his knowledge that she had just returned from the hospital put him on notice that she might be more vulnerable to harassment or verbal abuse” and thus finding that it was a jury question whether the defendant’s conduct was “rude and clumsy” or “extreme and outrageous”).[13] We thus find it appropriate to take into consideration Ms. Sullivan’s vulnerability in determining whether the questions posed by Mr. Schmidt constitute extreme and outrageous conduct or rude and clumsy conduct.
Illustrative of the application of the vulnerable victim factor, albeit in the context of a child, is Korbin v. Berlin, 177 So.2d 551 (Fla.Dist.Ct.App.1965). The Korbin case held that a six-year-old child stated a cause of action against a defendant who allegedly accused the child’s mother of adultery. In that ease, the defendant posed the following questions to the child: “ ‘Do you know that your mother took a man away from his wife? Do you know God is going to punish them? Do you know that a man is sleeping in your mother’s room?’ She then again repeated, ‘God will punish them.’ ” Korbin, 177 So.2d at 552. Finding the child had a cause of action, the Korbin court reasoned that “[r]elating, as they did, to the child’s mother, the content and import of the statements were such that it can not be said as a matter of law that this alleged deliberately harmful act was not one ‘calculated to cause ‘severe emotional distress’ to a person [child] of ordinary sensibilities.’” Korbin, 177 So.2d at 553.
117The question in the instant case is whether, given Ms. Sullivan’s vulnerability, an impartial trier of fact could find that Mr. Schmidt’s allegedly crass questions, albeit posed in a deposition, crossed the line to outrageousness. By analogy to Korbin, we find Mr. Schmidt’s crass questions, relating, as they did to Ms. Sullivan’s husband, the content and import of the statements were such that it cannot be said, as a matter of law, that this allegedly deliberately harmfdl act was not one calculated to cause severe emotional distress to an elderly, medically impaired person of ordinary sensibilities. Given Ms. Sullivan’s vulnerable condition coupled with the palpably irrelevant nature of the questions (a factor addressed below), we cannot conclude that she failed to state a cause of action for IIED.
The extramarital affair
Defendants contend that, as a matter of law, allegations of an extramarital affair cannot form the basis for an IIED claim. In support of this contention, defendants *762 cite Price v. Fuerst, 09-545 (La.App. 8 Cir. 11/4/09), 24 So.3d 289. The Price case held that “Louisiana law does not recognize a cause of action for intentional infliction of emotional distress based solely on allegations of an extramarital affair. The cause of action is similar to one for alienation of affection which has never been actionable in Louisiana.” Price, 09-545 at p. 2, 24 So.3d at 290. The Price case thus stands for the proposition that the jurisprudential recognition of an IIED cause of action in Louisiana “has not changed the longstanding Louisiana rule prohibiting recovery for alienation of affections or other ‘heart balm’ torts.” Frank L. Maraist and Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 2.06[5] (2004 ed.). The underlying suit does not involve a claim for the breakup of a marriage; thus, it is not an alienation of affection case. Defendants’ reliance on the Price case is misplaced.[14] | ^Defendants’ argument that, as a matter of law, Ms. Sullivan had no cause of action for IIED based on allegations of an extramarital affair is unpersuasive.
The broad scope of discovery
The trial court cited the broad scope of discovery under La. C.C.P. art. 1422 as a basis for its holding. Mr. Schmidt likewise suggests that the questions he posed to Ms. Sullivan were within the broad scope of permissible discovery. Because the test for discoverability of evidence is broader than the test for admissibility, the following three categories of evidence have been identified in terms of admissibility and discoverability: “(1) evidence which is admissible at the trial or hearing, (2) evidence which is discoverable, including, but not limited to, all evidence admissible at the trial or hearing, and (3) evidence which is neither admissible nor discoverable.” 1 Frank L. Maraist and Harry T. Lemmon, LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE § 9:1 (1999). A review of the facts and circumstances of the underlying case, as plead in the original and supplemental and amending petition, reveal that the questions posed fall into the third category— evidence that is neither admissible nor discoverable.
The questions Mr. Schmidt posed to Ms. Sullivan in the deposition were palpably irrelevant to the underlying suit. Stated otherwise, whether Mr. Bandaries |i9and his associate were having an affair has no potential relevance to the issues presented in the underlying suit. Ms. Sullivan’s damage claim in the underlying suit did not include any damages relative to her relationship with her husband. There was no loss of consortium claim urged by Mr. Bandaries or Ms. Sullivan in the original petition. The questions were thus outside the scope of proper discovery. The broad scope of discovery of a party does not provide a valid defense to Ms. Sullivan’s IIED claim.
Defendants also suggest that a protective order would have been the appropriate relief. A protective order is the proper *763 remedy when a party believes they are being subjected to improper questions at a discovery deposition. See La. C.C.P. art. 1444;[15] see also La. C.C.P. art. 1443 D.[16] In this case, the problem was not the deponent being required to answer the questions; rather, the problem was the questions themselves. As Ms. Sullivan points out, the questions were classic, improper “when did you stop beating your wife” type inquiries. Defendants’ suggestion that a protective order was the appropriate remedy is thus unpersuasive.
| Sf|Finally, Mr. Schmidt alleges that Ms. Sullivan’s cause of action for IIED is precluded by the application of the qualified privilege. The application of the qualified privilege in the context of the facts of this case is discussed in detail in the companion case, Bandaries v. Malta Park, 14-0823, 14-0824 (La.App. 4 Cir. 12/10/14), 156 So.3d 1200, 2014 WL 6983958. In the companion case, which is Mr. Bandaries’ defamation action against Mr. Schmidt, we conclude that the qualified privilege is not applicable because the requirement that the statements be pertinent to the litigation is not satisfied. For the same reason, we find Mr. Schmidt’s reliance on the qualified privilege to preclude Ms. Sullivan from asserting an IIED claim is misplaced.
Summarizing, given the palpably irrelevant nature of the questions posed coupled with Ms. Sullivan’s vulnerable condition, we find that she has stated a cause of action for IIED. We further find that Ms. Sullivan’s IIED cause of action is precluded by neither the broad scope of discovery nor the qualified privilege.

DECREE

For the foregoing reasons, the judgment of the trial court is reversed. This matter is remanded for further proceedings.
REVERSED AND REMANDED

. Although Ms. Sullivan also filed an IIED claim against Mr. Schmidt’s clients and an alleged insurer, -her IIED claim primarily was asserted against Mr. Schmidt.

. The trial court also granted the peremptory exception of no cause of action filed by the other defendants with the exception of the insurer. The insurer filed its own exceptions and is not a party to this appeal.

. In the original petition, Ms. Sullivan averred that she was represented by a power of attorney appointing Mr. Bandaries as her attorney in fact and caregiver and granting him "full power and authority and in her name and behalf” to "conduct, manage and transact all and singular her affairs.”

. For ease of discussion, the defendants in the original suit are referred to collectively as the "Malta Park Defendants.”

. The plaintiffs asserted the following causes of action: (1) fraud in the inducement, (2) strict liability pursuant to La. C.C. art. 2317.1, (3) failure to exercise reasonable and ordinary care over the premises, (4) negligent hiring, (5) a Louisiana Unfair Trade Practice Act claim, (6) breach of state law as to the administration of drugs to residents, (7) breach of fiduciary duty, (8) mental anguish, (9) invasion of Ms. Sullivan’s right to privacy, (10) unjust enrichment, (11) fraud, (12) negligent misrepresentation, (13) conspiracy, (14) detrimental reliance, (15) conversion, (16) duty to exercise reasonable care as to the premises, and (17) respondeat superior. The plaintiffs also asserted that their action satisfied the requirements for maintaining a class action and that the proposed class would be defined as Malta Park residents "who entered into contracts of service with MALTA PARK and did not receive the contract services promised by MALTA PARK.”

. On November 26, 2013, Mr. Bandaries commenced a separate suit based on the same incident (hereinafter the “Bandaries Suit ”). In the Bandaries Suit, Mr. Bandaries asserted a defamation claim against Mr. Schmidt and his law firm, Koch and Schmidt, LLC. The trial court granted the defendants' motion to consolidate the Bandaries Suit with the instant suit. In the Bandaries Suit, the trial court granted the motion for summary judgment filed by Mr. Schmidt and his law firm. Mr. Bandaries’ appeal from that ruling is the subject of a separate appeal, 2014-CA-0823 consolidated with 2014-CA-0824. An opinion in the appeal of the companion case is handed down contemporaneously with the opinion in this case. Bandaries v. Malta Park, 14-0823, 14-0824 (La.App. 4 Cir. 12/10/14), 156 So.3d 1200, 2014 WL 6983958.

. As to the Malta Park Defendants, Ms. Sullivan alleged that Mr. Schmidt was lead counsel for all the defendants, that he is the defendants’ agent, and that any liability attributed to him could be vicariously asserted against his principals.

. In November 2013, Old Republic answered and asserted exceptions of no cause and no right of action in its answer. The record does not reflect a ruling on Old Republic’s exceptions. Nor is Old Republic a party to this appeal. Also in November 2013, Mr. Schmidt filed a motion to strike Ms. Sullivan's First Supplemental and Amended Petition on procedural grounds: the trial court denied the motion to strike in December 2013. Also in December 2013, Ms. Trimble withdrew as counsel of record for Ms. Sullivan.

. Although the trial court’s judgment refers to Mr. Schmidt’s law firm (Koch & Schmidt, LLC) as a defendant, Ms. Sullivan did not join the law firm as a defendant in this suit. Mr. Bandaries, however, did join the law firm in the Bandaries Suit — the companion, separate suit he filed for defamation.

. The Louisiana Supreme Court held in Montalvo v. Sondes, 93-2813 (La.5/23/94), 637 So.2d 127, that an attorney does not owe a duty to his client’s adversary and that an attorney thus cannot be held liable to the non-client for malpractice or negligent breach of a *758 professional obligation to the non-client. Although Penalber v. Blount, 550 So.2d 577 (La.1989) re-affirmed the basic principle that an attorney acting on behalf of his client may not be sued by an adversary based on negligence or malpractice, it allowed a cause of action against an attorney based on intentional tort, reasoning as follows:
Intentionally tortious actions, ostensibly performed for a client’s benefit, will not shroud an attorney with immunity. Consequently, even though an attorney does not generally owe a duty to his client’s adversary, under the broad ambit of LSA-C.C. art. 2315, an attorney may be held personally accountable for his intentional tortious conduct....
Penalber, 550 So.2d at 582. Hence, an attorney can be held liable to his client’s adversary if he commits an intentional tort against the adversary.

. La. C.C.P. art. 1422 provides that ”[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.”

. Summarizing the Nickerson case, a commentator states:
A 45-year-old woman who earlier had been committed to an insane asylum was told by a fortune teller that her ancestors had buried a pot of gold on another’s land. The landowner allowed the woman to dig for the gold on his land. Thereafter, some *760 practical jokers buried a pot of dirt and with it a note warning that the pot should not be opened until three days after discovery. The victim opened it and found she had been duped. She died two year later, after suffering extensive emotional distress. The court, recognizing the mental suffering and humiliation the victim had endured, awarded her heirs $500 and indicated that, had the victim been alive, the award would have been greater.
Frank L. Maraist and Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 2.06[5], n.47 (2004 ed.). Likewise, Illustration 9 to Restatement (Second) of Torts § 46 cmt. f is based on the Nickerson case and concludes that burying a pot in a yard would not be outrageous but for B's knowledge of As eccentricity. The Louisiana Supreme Court in White also noted the Nickerson pot-of-gold case, pointing out that Nickerson is "[o]ften mentioned” and that in Nickerson "nominal damages were awarded to a middle-aged mentally deficient woman who suffered severe mental distress as the result of a cruel practical joke.”

. See also Ratcliff v. Boydell, 93-0362, 92-0630, pp. 12-13 (La.App. 4 Cir. 4/3/96), 674 So.2d 272, 280 (“defendants’ vindictive, dilatory, and obstreperous behavior” in litigating a fee dispute for six years coupled with, among other things, "defendants' knowledge that plaintiff had more than an ordinary dislike for trial having themselves sent her to two psychiatrists during the wrongful death proceedings” constituted intentional infliction of emotional distress).

. Likewise, defendants' reliance on Preis v. Durio, 94-468 (La.App. 3 Cir. 11/2/94), 649 So.2d 600, is misplaced. In the Preis case, the court held that ‘‘[a]n attorney representing a party in a marital dispute where there are children does not owe a legal duty to the adversarial spouse-joint custodian of the children to avoid discussing the case with the children against the will of the adversarial spouse, when the defendant-attorney has the consent of the client spouse who is the other joint custodian of the children." Preis, 94-468 at p. 6, 649 So.2d at 603. In so holding, the court cited "[t]he [well established] rule that an attorney does not owe a legal duty to his client’s adversary when acting on his client’s behalf.” Id. (citing Penalber v. Blount, 550 So.2d 577, 581 (La.1989)). Unlike in Preis, the underlying suit in this case was not a marital dispute between two contentious spouses in which the attorneys were maligning each other.

. La. C.C.P. art. 1444 provides:
At any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Article 1426. If the order made terminates the examination, it shall be resumed thereafter only upon the order of the court. Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order. The provisions of Article 1469 apply to the award of expenses incurred in relation to the motion.

. La. C.C.P. art. 1443 D provides that a "party may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence imposed by the court, to prevent harassing or repetitious questions, or to prevent questions which seek information that is neither admissible at trial nor reasonably calculated to lead to the discovery of admissible evidence.”